UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDREW LA PAZ,

               Plaintiff,

      -against-

COMMISSIONER OF SOCIAL SECURITY,

             Defendant.

15cv06353 (AJN) (DF)

**REPORT AND
RECOMMENDATION**

---

**TO THE HONORABLE ALISON J. NATHAN:**

In this action, *pro se* plaintiff Andrew La Paz ("Plaintiff") seeks review of the final

decision of defendant Commissioner of Social Security ("Defendant" or the "Commissioner"),

denying Plaintiff Supplemental Security Income ("SSI") and disability insurance ("SSDI")

benefits under the Social Security Act (the "Act") on the ground that Plaintiff's impairments did

not constitute a disability for purposes of the Act.  Currently before this Court for a report and

recommendation is Defendant's motion, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for judgment on the pleadings affirming the Commissioner's decision and dismissing

the Complaint.  (Dkt. 11.)  For the reasons set forth below, I respectfully recommend that

Defendant's motion be granted.

## BACKGROUND[1]

Plaintiff filed applications for SSI and SSDI benefits on February 26, 2014, alleging, in

both applications, disability as of November 25, 2011, due to diabetes, herniated discs, arthritis,

---

[1] The background facts set forth herein are taken from the Social Security Administration
Administrative Record (Dkt. 10) (referred to herein as "R." or the "Record"), which includes,
*inter alia*, Plaintiff's medical records and the transcript of an October 29, 2014 hearing held
before Administrative Law Judge ("ALJ") Miriam L. Shire, at which Plaintiff testified.

and a nerve disorder.  (R. at 101-02, 109-10, 168, 175, 195.)  After a hearing, the ALJ

determined that, despite the fact that Plaintiff had certain severe impairments (including

psychiatric impairments that were evident from the Record, although Plaintiff did not assert them

as the basis of his claim of disability), Plaintiff was nonetheless able to work at jobs existing in

significant numbers in the national economy, and, therefore, was not disabled for the purposes of

the Act.  (*Id.* at 28.)  This decision was affirmed by the Social Security Appeals Council, and

thereafter became the "final decision" of the Commissioner.  (*Id.* at 1-5.)  Plaintiff now

challenges the Commissioner's denial of benefits.

### A.    **Plaintiff's Personal and Employment History**

Plaintiff was born on March 11, 1971, and was 42 years old at the time he filed his

applications.  (*Id.* at 168, 175.)  He lives alone in the Bronx, New York, has never been married,

and has no children.  (*Id.* at 168-69, 175-76.)  According to Plaintiff's hearing testimony and a

Disability Report that he filed with the Social Security Administration ("SSA"), Plaintiff

completed the 11th grade, earned a GED, and attended Iona College for one year, where he

studied "computer science applications."  (*Id.* at 41, 196.)  He also worked from approximately

1990 to 2009 at various jobs, including as a "car parts helper and picker," a "food packer," and,

most recently, a "table saw operator."  (*Id.* at 42-45, 196, 223.)  After being let go from his

position as a table saw operator in January 2009, he did not work again until 2014.  (*Id.* at 45-

48.)  In 2014, Plaintiff performed clerical work three days a week, for several months, in

exchange for welfare checks.  (*Id.*)  In a "Function Report – Adult" that he filed with the SSA,

dated May 7, 2014, Plaintiff indicated that he bought groceries for himself four times per month,

prepared his own meals, used public transportation, did limited household chores such as

cleaning and ironing, and dressed and bathed himself.  (*Id.* at 217-21.)

### B.   **Medical Evidence**

As Plaintiff reported that his disability began on November 25, 2011, the relevant period

under review for Plaintiff's SSDI benefits runs from that date through March 31, 2014, the date

that Plaintiff was last insured.  *See Swainbank v. Astrue*, 356 F. App'x 545, 547 (2d Cir. 2009)

("To be eligible for disability benefits [SSDI] the claimant must demonstrate that [he or] she was

disabled on the date [he or] she was last insured for benefits." (citing *Arnone v. Bowen*, 882 F.2d

34, 37-38 (2d Cir. 1989))); *see also* 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.130,

404.315(a).[2]  The relevant period under review for Plaintiff's SSI benefits, however, runs from

February 26, 2014, the date that Plaintiff applied for those benefits, through May 15, 2015, the

date of the ALJ's decision.  *See Frye v. Astrue*, 485 F. App'x 484, 485 n.1 (2d Cir. 2012) (noting

that, for purposes of an application for SSI benefits, a claimant must show that he or she was

disabled between the time the application was filed and the time of the ALJ's decision); *see also*

20 C.F.R. § 416.335.

The relevant medical evidence of record consists of treatment records and other

information provided by Plaintiff's treating sources, as well as reports of examinations

conducted by a consulting internist and psychologist.  In total, the Record in this matter spans

1,450 pages, and includes medical records, dated 2008 to 2014, authored by numerous different

treaters at several different hospitals.[3]  In the following summary of the medical evidence, this

---

[2] "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage,'" *i.e.*, quarters in which the applicant earned wages and paid taxes, "to total quarters."  *Arnone*, 882 F.2d at 37-38.  To qualify for SSDI, an applicant must establish that he or she became disabled on or before the expiration of his or her insured status.  *Id.* at 38. Here, the SSA and ALJ determined that Plaintiff's last date of insured coverage was March 31, 2014.  (*See, e.g.*, R. at 12, 207.)  Plaintiff has not challenged that determination.

[3] A few documents appear in duplicate in the Record, and certain documents that are poorly scanned or copied in one instance appear in readable form elsewhere in the Record.

Court has omitted the names of the physicians, physician's assistants, and therapists who saw Plaintiff on his many visits to treatment facilities, except where it appears that Plaintiff had a continuing treatment relationship with such individuals.  The treaters seen by Plaintiff on a repeat basis during the relevant period include his primary care physician, Dr. Matsuko Takeshige; a physiatrist, Dr. Timur Hanan; a cardiologist, Dr. Bodh Das; a urologist, Dr. Howard Morgenlander; a proctologist, Dr. Evelyn Irizarry; and two psychiatrists, Drs. Flavia Robotti and Brian Pell.

### 1.     Evidence Pre-Dating the Relevant Period

The Record contains some evidence the pre-dates Plaintiff's alleged disability onset date of November 25, 2011.  As this evidence provides background information relevant to Plaintiff's claims, it is briefly reviewed here.

### a.     Evidence Related to Depression and Anxiety

Plaintiff's medical records indicate that he attempted suicide in 1999 by "tr[ying] to overdose by taking 100 pills."  (*See id.* at 975, 1006.)  His records also show that, in July 2009, he expressed suicidal ideations after he was diagnosed with diabetes.  (*Id.* at 275.)  Thereafter, he was also diagnosed with depression and alcoholism.[4]  (*Id.* at 475.)  His score on a PHQ-9 Questionnaire[5] suggested "severe depression," and he was referred to a social worker.  (*Id.*

---

(*Compare, e.g.*, *id.* at 846-47 *with id.* at 1166-67; *id.* at 772-73 *with* 960-61, 1321-22.)  Even so, the record is voluminous.

[4] Plaintiff described a significant history of alcohol consumption; he reported that he began drinking at the age of nine, and, at one point, drank as many as eight or more cans of beer per day.  (*Id.* at 976, 980.)  He told doctors, however, that he stopped consuming alcohol altogether in July 2009.  (*See id.* at 457, 460-61.)

[5] "The PHQ-9 is the nine item depression scale of the Patient Health Questionnaire, which is completed by the patient and assists primary care clinicians in diagnosing depression as well as selecting and monitoring treatment.  The PHQ-9 is based directly on the diagnostic criteria for major depressive disorders in the *Diagnostic and Statistical Manual Fourth Edition*

at 476.)  Plaintiff apparently attempted suicide again in December 2009, when he took two shots of vodka together with two sleeping pills.  (*Id.* at 291, 1006.)  Although he would later tell his psychiatrist that this was, indeed, a suicide attempt (*id.*), at the time, he told treaters at the Sound View Throgs Neck Community Mental Health Center ("Sound View") that the incident simply reflected "bad judgment" and was not a suicide attempt (*id.* at 291).

Records of Lincoln Medical and Mental Health Center ("Lincoln") from May 2010 reflect that Plaintiff complained to a physician that he suffered from "moderate to high levels of an anxiety and was concerned about taking too many medications."  (*Id.* at 347.)  Then, in July 2010, Plaintiff had a psychiatric consultation at Lincoln, apparently occasioned by his complaints that he felt depressed due to his financial situation at home, wished to die, and had anxiety.  (*Id.* at 318.)  Despite those reported complaints, Plaintiff, upon examination, denied suicidal thoughts.  (*Id.* at 318-20.)  He reportedly told the examiner that he did not, in fact, want to die, but that he experienced anxiety due to a sore and swollen throat, which made him "feel like he might die."  (*Id.* at 318.)  Later that month, Plaintiff's primary care physician, Dr. Takeshige, diagnosed him with a dysthymic disorder,[6] and also noted an "[o]bservation of other suspected mental condition."  (*Id.* at 311-12.)  Plaintiff was later diagnosed with an "adjustment disorder with anxiety," and was treated for that disorder at Sound View in December 2009.  (*Id.* at 288-293.)[7]

---

(DSM-IV)."  *Scott v. Colvin*, No. 14cv7331 (RMM), 2016 WL 5173252, at *4 n.5 (E.D.N.Y. Sept. 21, 2016).

[6] Dysthymic disorder is "a mood disorder characterized by chronic mildly depressed or irritable mood[,] often accompanied by other symptoms ([such] as eating and sleeping disturbances, fatigue, and poor self-esteem)."  http://www.merriam-webster.com/dictionary/dysthymia (last accessed Jan. 26, 2017).

[7] Lincoln medical records also reflect that Plaintiff was diagnosed with bipolar disorder in February 2011.  (*Id.* at 1300.)  Despite being represented by counsel before the SSA, Plaintiff

b.      **Evidence Related to Right Shoulder and Lower Back Injury**

In early 2008, Plaintiff injured his lower back and right shoulder while lifting a "heavy door" at work.  (*Id.* at 523.)  The incident caused him dizziness, and he was taken in an ambulance to the Sound Shore Medical Center ("Sound Shore").  (*Id.* at 988.)  X-rays showed "[m]inimal end plate spurring," but "[n]o fracture or dislocation."  (*Id.* at 991.)  Despite this injury, Plaintiff later returned to work, and continued at the same job until he was let go in January 2009.  (*Id.* at 45.)

As Plaintiff continued to complain of pain in his right shoulder and lower back, his treaters at Lincoln ordered that additional X-rays be taken in August and October 2011.  (*See id.* at 368-69.)  Plaintiff's shoulder X-ray showed that his "joint spaces [were] preserved," and that he had no fractures or dislocations.  (*Id.* at 369.)  Plaintiff's back X-ray showed that his sacroiliac joints were "normal," that there was "straightening of the normal lordosis secondary to muscle spasm," and that there was no evidence of a dislocation.  (*Id.* at 368.)

On November 23, 2011, just two days prior to Plaintiff's alleged disability onset date of November 25, 2011, Plaintiff was seen by a physiatrist, Dr. Hanan, at Lincoln, for further complaints of right shoulder pain.  (*Id.* at 375.)  Dr. Hanan's treatment notes indicate that Plaintiff's pain at the time was "4-5/10, worse on movements and overhead activity," and that Plaintiff was not taking any pain medication.  (*Id.*)  Dr. Hanan's report further notes that Plaintiff's X-rays were "normal" and that he was "[f]unctionally independent."  (*Id.*)  Dr. Hanan

---

did not mention in his submissions or testimony that he suffered from bipolar disorder.  Nor did he claim that he was disabled due to bipolar disorder.  Moreover, outside of vague references to Plaintiff's bipolar condition in Lincoln medical records, the Record does not include any specific bipolar disorder medication or treatment.  Accordingly, this Court does not address this condition further in this Report and Recommendation.

advised Plaintiff that he should "[a]void heavy lifting" and take Tylenol as needed, and referred him for occupational therapy.  (*Id.*; *see also id.* at 350.)

c.   <u>**Evidence Related to Diabetes**</u>

Plaintiff seems to have been diagnosed with type 2 diabetes milletus in mid-2009[8] after tests showed that his blood glucose level was 378 mg/DL.  (*See id.* at 460; *see also id.* at 278, 457.)  In August 2009, a physician at the Jacobi Medical Center ("Jacobi") noted that Plaintiff was not monitoring his blood sugar.  (*Id.*)  In October 2009, a podiatrist at Jacobi who examined Plaintiff due to his complaints of toenail pain, assessed Plaintiff with having "[e]arly diabetic neuropathy."  (*Id.* at 454-55.)

Over a year later, in November 2010, a physician at Lincoln reported that Plaintiff's diabetes was "[u]ncontrolled," and that Plaintiff had expressed being "afraid to check his fs [fasting sugars] due to pain," despite having been made "aware [that] uncontrol[led] [diabetes] can inc[rease] [the] risk of [a] medical[ly] adverse event."  (*Id.* at 296.)  The physician also noted that Plaintiff was non-compliant with his prescribed oral medications and was refusing insulin. (*Id.*)  The physician "[a]dvised [Plaintiff] extensively regarding [the] importance of medication compliance, dietary modifications[,] and exercise."  (*Id.*)  Physician treatment notes dated April 2011 and August 2011, however, reflect that Plaintiff continued to be non-compliant with his diabetes treatment plan.  (*See id.* at 384-86, 389-90.)  In October 2011, a podiatrist at Lincoln,

---

[8] The ALJ, referencing the report of consultative examiner Sharon Revan, M.D., stated that Plaintiff was diagnosed with diabetes in 2006.  (*See id.* at 19.)  Plaintiff's medical records, however, suggest that this date is incorrect.  Jacobi records include blood test results from June 2009, showing an elevated blood glucose level (*see id.* at 460), and a July 15, 2009 report in the Lincoln records states that Plaintiff had "a new onset DM 10 days ago" (*id.* at 278; *see also id.* at 601 (August 2012 Lincoln diabetes clinic report stating that Plaintiff has had diabetes for four years)).

who examined Plaintiff for foot pain, noted that Plaintiff had developed peripheral neuropathy.

(*Id.* at 378.)

### 2. Evidence From the Alleged Disability Onset Date Through the Date of Plaintiff's Benefits Applications (November 25, 2011 – February 26, 2014)

#### a. Evidence Related to Right Shoulder, Lower Back, and Left Knee Pain

Plaintiff saw Dr. Hanan again for increased pain his right shoulder on December 1, 2011. (*Id.* at 350-51.)  Plaintiff rated the pain as 6/10 and reported increased discomfort at night.  (*Id.* at 351.)  Dr. Hanan noted that Plaintiff presented with a decreased range of motion throughout his right shoulder, and right-hand grip weakness.  (*Id.*)  With the exception of Plaintiff's right shoulder, however, his active range of motion in both upper extremities was within normal limits.  (*Id.* at 350.)  Dr. Hanan educated Plaintiff on range-of-motion and pain-management techniques, and set short-term goals for Plaintiff to improve his shoulder condition through home exercise and occupational therapy.  (*Id.*)  Plaintiff saw Dr. Hanan again at the end of December and reported that his right shoulder pain had decreased to 4/10.  (*Id.* at 358.)  Dr. Hanan's report indicates that Plaintiff was showing a "slow increase" in strength in his right upper extremity and tolerating his therapeutic exercises "well."  (*Id.*)

The following week, in January 2012, Plaintiff saw an orthopedist at Lincoln with complaints of "pain all the time any time" in his right shoulder.  (*Id.* at 358.)  Plaintiff informed the orthopedist that rehabilitation had provided him with "some relief" and that he was not taking any pain medications.  (*Id.*)  The orthopedist performed a physical examination of Plaintiff's right shoulder and noted a positive Neer's impingement sign.[9]  (*Id.* at 523.)  The orthopedist also

---

[9] The Neer test is used to "identify impingement of the rotator cuff."  http://medical-dictionary.thefreedictionary.com/Neer+test (last accessed Jan. 26, 2017).

reported that Plaintiff's right shoulder X-ray showed minimal degenerative joint disease, and referred him for an MRI.  (*Id.* at 523-24.)  The MRI ruled out a rotator cuff tear, but showed "degenerative changes of the acromioclavicular joint."  (*Id.* at 495.)

In a March 2012 appointment with an occupational therapist at Lincoln, Plaintiff complained of 6/10 pain in the right shoulder and maintained that his pain had not decreased, despite his compliance with his home exercise program.  (*Id.* at 544.)  The occupational therapist treated Plaintiff's shoulder with heat, ultrasound, and tissue massage; reviewed therapeutic and strength exercises with him; and noted that Plaintiff's response to the treatment was "good" and that he had tolerated the session "well."  (*Id.*)

Plaintiff was examined by Dr. Hanan again in May 2012 for right shoulder pain, and informed Dr. Hanan that there had been "no change" in his condition since beginning occupational therapy.  (*Id.* at 571.)  Plaintiff rated his pain as 4/10, "worse on movements and overhead activity."  (*Id.*)  Given the lack of pain improvement and Plaintiff's "minimal" range of motion improvement, Dr. Hanan discontinued Plaintiff's occupational therapy.  (*Id.*)  Dr. Hanan noted that Plaintiff was functionally independent, but should avoid heavy lifting and continue taking Tylenol.  (*Id.*)  He discharged Plaintiff "[h]ome to usual activities" and referred him to Lincoln's orthopedics department.  (*Id.*)

Plaintiff was again examined by a Lincoln orthopedist in August 2012.  (*Id.* at 596.)  The orthopedist reported that Plaintiff had limited range of motion and an impingement in his right shoulder, and that Neer and Hawkins tests[10] were positive.  (*Id.*)  The orthopedist also noted Plaintiff's complaints of lower back pain and ordered X-rays and an MRI.  (*Id.*)  The X-ray of

---

[10] The Hawkins test assesses "rotator cuff tendonitis and subacromial impingement." http://medical-dictionary.thefreedictionary.com/hawkins+test (last accessed Jan. 26, 2017).

Plaintiff's lumbosacral spine revealed mild disk degeneration between L4 and L5 (*id.* at 489), and the MRI showed degenerative joint disease (*id.* at 593).

Plaintiff was seen for a follow-up appointment with Dr. Hanan in September 2012, at which time Plaintiff complained of 3/10 pain and stated again that there was no change in his condition. (*Id.*) Dr. Hanan advised Plaintiff to continue his home exercise program, continue taking Tylenol, and avoid heavy lifting. (*Id.*) As before, the doctor discharged Plaintiff home to his usual activities. (*Id.*)

In an unscheduled visit to Lincoln's cardiology clinic in December 2012, Plaintiff complained of 6/10 pain in his right shoulder and lower back. (*Id.* at 464-65.) Two months later, in February 2013, Plaintiff was examined by a physician at Lincoln, for complaints of 3/10 shoulder pain. (*Id.* at 772.) The physician noted that Plaintiff was "in no acute distress" at the time and was independent with his daily activities, but referred him to the orthopedics department due to his continued complaints of pain. (*Id.*) A physician's assistant in the orthopedics department examined Plaintiff in March 2013, and assessed Plaintiff with a right shoulder impingement. (*Id.* at 759-60.) Plaintiff reported that he was not taking any pain medications and did not want an injection or surgery as treatment. (*Id.*; *see also id.* at 750.) Plaintiff was prescribed Diclofenac[11] and referred for rehabilitation. (*Id.* at 760.)

Plaintiff was examined again at Lincoln in May 2013 with complaints of right shoulder pain rated 4/10 (*id.* at 739-40), and lower back and left knee pain, which he reported having experienced "intermittently since 2008 with an increase in severity in the past 3 months" (*id.* at 731, 735-36). An X-ray of his knees showed no fractures or dislocations, but revealed "mild"

---

[11] Diclofenac is a nonsteroidal anti-inflammatory drug used to treat "mild to moderate pain." https://medlineplus.gov/druginfo/meds/a689002.html (last accessed Jan. 26, 2017).

degenerative joint disease in the left knee.  (*Id.* at 715, 802.)  A subsequent MRI of his spine, dated June 2013, showed "grade 1 retrolisthesis," "mild to moderate canal stenosis," "moderate left foraminal narrowing," and "mild right foraminal narrowing."[12]  (*Id.* at 713-14.)  Plaintiff again refused injection or surgery as treatment options.  (*Id.* at 801.)

In August 2013, Plaintiff complained to a physician's assistant in the neurosurgery department at Lincoln that his lower back pain had still not improved.  (*Id.* at 1405-06.)  The physician's assistant noted that Plaintiff had on-and-off left radiculopathy and experienced "numbness and tingling" on the bottom of his left foot.  (*Id.* at 1405.)  He recommended "conservative management," and, if that failed, surgery.  (*Id.* at 1407.)  That same month, Dr. Hanan examined Plaintiff again, for lower back pain radiating to his lower-left extremities "with numbness."  (*Id.* at 1045.)  Dr. Hanan diagnosed Plaintiff with lumbago, referred him for physical therapy, advised him to continue taking pain medications and engaging in his home exercise program, and discharged Plaintiff home to his usual activities.  (*Id.*)  Plaintiff began seeing a physical therapist at Lincoln the following month.  (*Id.* at 1046-50; *see also id.* at 1066.)[13]  The physical therapist wrote in his report that Plaintiff was independent with personal

---

[12] "Retrolisthesis is a posterior displacement of a vertebral body that can cause localized back pain, pain on hyperextension, and sciatic pain due to irritation of the first sacral nerve root." *Kessler v. Colvin*, 48 F. Supp. 3d 578, 586 n.5 (S.D.N.Y. 2014) (citing *Dorland's Illustrated Medical Dictionary*, 619 (27th ed. 1988)).  Spinal stenosis is defined as the "narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine to your arms and legs."  http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last accessed Jan. 26, 2017). Foraminal stenosis refers to the "narrowing of the foramen through which the spinal nerve exits the spinal canal."  *Sickler v. Colvin*, No. 14cv1411 (JCF), 2015 WL 1600320, at *9 & n.12 (S.D.N.Y. Apr. 9, 2015) (citing Mladen Djurasovic et al., *Contemporary Management of Symptomatic Lumbar Spinal Stenosis*, 41 Orthop. Clin. N. Am. 183, 185 (2010)).

[13] Dr. Hanan wrote in his report that Plaintiff was scheduled for spinal surgery on October 31, 2013.  (*Id.* at 1066.)  Plaintiff's treatment records, however, reflect that the only

care and in all of his activities of daily living, and was able to tolerate the physical therapy treatment provided.  (*Id.* at 1047, 1049.)

Later in October 2013, Plaintiff reported to another physician's assistant in the neurosurgery department at Lincoln that his physical therapy session had provided him no relief. (*Id.* at 1062.)  Although Plaintiff indicated that he would refuse an epidural steroid injection for his lower back pain, he stated that he would be open to undergoing surgery.  (*Id.*)  The discussion of surgery, however, was put off to a later date.  (*Id.*)

Plaintiff visited Lincoln again for right shoulder pain in December 2013, rating his pain as 5/10.  (*Id.* at 1147.)  He informed a physician in the rehabilitation department that he was not taking any pain medications.  (*Id.*)  That physician noted that Plaintiff's X-rays were "normal," and, upon examination, diagnosed him with "[d]isorders of bursae and tendons in shoulder region, unspecified."  (*Id.*)  The physician further reported that Plaintiff was independent in his activities of daily living and self-care, set a plan of additional occupational therapy, and discharged him home to his usual activities.  (*Id.*)

Plaintiff resumed occupational therapy in January 2014.  (*Id.* at 1153-55.)  Following a January 8, 2014 therapy session, his occupational therapist reported that, although Plaintiff complained of 6/10 pain in his right shoulder, he demonstrated full active range of motion and strength.  (*Id.* at 1154; *see also id.* at 1153 (finding that Plaintiff's active range of motion in both upper extremities was within normal limits).)  During Plaintiff's January 28, 2014 therapy session, he only complained of 3/10 pain in his right shoulder.  (*Id.* at 1171.)

---

procedures Plaintiff had on October 31, 2013 were a cystoscopy and urethral dilation.  (*See id.* at 1092-93.)

Also in late January 2014, Plaintiff visited the neurosurgery department at Lincoln complaining of 6/10 lower back pain, and inquiring about surgery.  (*Id.* at 1137.)  He informed the physician's assistant that pain medications provided him with "minimal relief" and that physical therapy provided him with no relief.  (*Id.*)  He visited the neurosurgery department again in early February 2014.  (*Id.* at 1166.)  At that time, he was informed that he was not a surgical candidate and that he should continue conservative treatment for his back pain.  (*Id.*)  His spinal X-ray showed no fracture, dislocation, or listhesis.  (*Id.*)  He requested a back brace.  (*Id.*)

Plaintiff saw his occupational therapist again in mid-February 2014, complaining of 7/10 pain in his right shoulder.  (*Id.* at 1173.)  The occupational therapist discharged Plaintiff from occupational therapy because his pain level had not improved with treatment and he had "functional use" of his right upper extremity.  (*Id.*)

### b.  Evidence Related to Diabetes

In April 2012, Plaintiff's primary care physician, Dr. Takeshige, diagnosed Plaintiff with "background diabetic retinopathy."  (*Id.* at 534.)  The following month, Dr. Takeshige noted that Plaintiff was still refusing to check his blood glucose level at home.  (*Id.* at 558.)  A report from Lincoln's diabetes clinic dated August 2012 indicates that Plaintiff was previously discharged from the clinic due to his refusal to take insulin, check his blood glucose level, and take certain medications, but that he was referred back by Dr. Takeshige because his diabetes was uncontrolled.  (*Id.* at 600.)  The report also notes that Plaintiff's blood sugar level had worsened over the past year.  (*Id.* at 601.)  The physician who examined Plaintiff at the clinic stated that he "[e]xtensively educated [Plaintiff] regarding diet and medication intake," advised him to monitor his blood glucose levels, and educated him regarding insulin.  (*Id.* at 601-02.)  In response,

Plaintiff "adamantly refus[ed] daily injection[s]," and inquired regarding an insulin pump.  (*Id.* at 602.)  The physician informed him that he would need to check his blood glucose levels even to qualify for a pump.  (*Id.* at 602.)  Ultimately, the physician concluded that there was "not much else to offer" Plaintiff, given that he was already taking four oral agents for his diabetes.  (*Id.*)  He encouraged Plaintiff to take diabetes classes, and discharged him from the clinic.  (*Id.*)

Plaintiff visited the Lincoln urology department in November 2012 to review the results of a bladder ultrasound, discussed further below.  (*Id.* at 657.)  The urologist who examined Plaintiff determined that Plaintiff's "history and sonogram results point[ed] in the direction of diabetic neuropathy of the bladder."  (*Id.* at 658.)  During their appointment, the urologist "discussed in detail" with Plaintiff the long-term effects of uncontrolled diabetes, including blindness, amputations, renal failure, constipation, and the potential need for urinary diversion.  (*Id.*)  According to the urologist's treatment notes, Plaintiff stated that he understood what was discussed and would be willing to monitor his blood sugar and "be more compliant."  (*Id.*)  Treatment notes from separate physicians at Lincoln dated March 2013 and May 2013, however, indicate that Plaintiff continued to refuse to monitor his blood sugar or take insulin.  (*Id.* at 762, 1343-44.)

In September 2013, following Plaintiff's gallbladder removal, a physician at Lincoln reported that Plaintiff "suffer[ed] from gastroparesis[14] due to his diabetes."  (*Id.* at 1296.)  From September 2013, through the date of Plaintiff's benefits application on February 26, 2014, Plaintiff's treaters continued to document Plaintiff's diabetes as "uncontrolled," and continued to

---

[14] "Gastroparesis is a condition that reduces the ability of the stomach to empty its contents. . . . The condition is a common complication of diabetes." https://medlineplus.gov/ency/article/000297.htm (last accessed Jan. 26, 2017).

note that Plaintiff was refusing to monitor his blood glucose level or inject himself with insulin. (*See, e.g.*, *id.* at 1289 (Sept. 2013), 1071 (Oct. 2013), 1143 (Jan. 2014).)

### c.      Evidence Related to Heart Conditions

Plaintiff was referred to Lincoln's cardiology department for the first time in May 2012, after an electrocardiogram ("EKG") and an echocardiogram ("ECHO") that he underwent prior to a dental procedure showed "abnormal" results.  (*Id.* at 526-29.)  Plaintiff denied chest pain at the time.  (*Id.* at 527.)  He stated that he had experienced recent episodes of palpitations, "lasting a few seconds" and "occurring randomly [both] at exertion [and] at rest," but indicated that they were "not bothersome."  (*Id.*)  Two weeks after this appointment, a cardiologist at Lincoln, Dr. Das, administered another EKG, which showed a right bundle branch block.[15]  (*Id.* at 568.) Dr. Das also noted that Plaintiff's prior ECHO showed a "mildly reduced" ejection fraction,[16] and recommended that Plaintiff be investigated for coronary artery disease.  (*Id.* at 568-69.)

In June 2012, Plaintiff underwent a series of heart tests and procedures.  On June 1, 2012, Plaintiff underwent a myocardial perfusion scan,[17] which indicated global hypokinesia[18] and

_____

[15] "Bundle branch block is a condition in which there[] [is] a delay or obstruction along the pathway that electrical impulses travel to make your heart beat. . . . Bundle branch block sometimes makes it harder for your heart to pump blood efficiently through your circulatory system."  http://www.mayoclinic.org/diseases-conditions/bundle-branch-block/basics/definition/con-20027273 (last accessed Jan. 26, 2017).

[16] "Ejection fraction is a measurement of the percentage blood leaving your heart each time it contracts."  http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286 (last accessed Jan. 26, 2017).

[17] A myocardial perfusion scan is a nuclear medicine procedure used to evaluate the hart's function and blood flow.  *See* http://www.hopkinsmedicine.org/healthlibrary/test_procedures/cardiovascular/myocardial_perfusion_scan_stress_92,P07979/ (last accessed Jan. 26, 2017).

[18] Hypokensia refers to an "abnormally decreased muscular movement." https://www.merriam-webster.com/medical/hypokinesia (last accessed Jan. 26, 2017).

ejection fractions below normal limits.  (*Id.* at 490-91, 630.)  The following week, he was referred to Harlem Hospital ("Harlem") for further tests.  (*Id.* at 626-29.)  At Harlem, Plaintiff underwent a left heart catheterization, a left ventriculogram, and a coronary angiography, which revealed coronary artery disease, with 75-80% stenosis[19] (*id.* at 397-99), and a "severe" lesion on his right coronary artery (*id.* at 415-16).  Thereafter, Plaintiff was referred to Bellevue Hospital Center ("Bellevue") for a cardiac catheterization.  (*Id.* at 401.)  Upon being seen at Bellevue, Plaintiff reported to the examining physician that he had experienced left-sided chest pressure, dizziness, shortness of breath after exertion, and occasional palpitations since 2008, with symptoms worsening over the last 18 months.  (*Id.*)  The physician at Bellevue diagnosed him with coronary atherosclerosis.[20]

On June 28, 2012, Plaintiff underwent an elective cardiac catheterization with two stents placed in his right coronary artery.[21]  (*Id.*)  Following the procedure, Plaintiff reported that he did not have any chest pain.  (*Id.* at 410.)  He was seen for a follow-up appointment at Lincoln with Dr. Das in early July 2012, during which he again denied chest pain, but stated that he was still experiencing shortness of breath upon exertion.  (*Id.* at 610-12.)  Plaintiff saw Dr. Das for a follow-up in August 2012, and reported no new complaints.  (*Id.* at 604-06.)  Dr. Das noted that he saw no signs of congestive heart failure at that time.  (*Id.* at 607.)

---

[19] Stenosis in this context refers to the narrowing of an aortic valve, which prevents the valve from fully opening and obstructs blood flow from one's heart.  *See* http://www.mayoclinic.org/diseases-conditions/aortic-stenosis/basics/symptoms/con-20026329 (last accessed Jan. 26, 2017).

[20] "Atherosclerosis is a disease in which plaque builds up inside your arteries." https://medlineplus.gov/atherosclerosis.html (last accessed Jan. 26, 2017).

[21] Plaintiff apparently informed consultative examiner Dr. Revan that these stents were placed "after [a] heart attack."  (*See id.* at 979.)  Contemporaneous records, however, do not show that Plaintiff suffered a heart attack in 2012 or at any other point.

Plaintiff had another follow-up appointment with Dr. Das in December 2012.  (*Id.* at 652.)  At that time, Plaintiff reportedly complained of "sharp pain in the left chest and on the right side of the body, lasting for a second or two, happening at rest mostly, about twice a month."  (*Id.*)  He also reported getting palpitations "sometimes."  (*Id.*)  Noting that Plaintiff did not experience much improvement in his exercise tolerance post-stenting, Dr. Das ordered a stress test.  (*Id.* at 654-55.)  Dr. Das also reported again that he saw no signs of congestive heart failure.  (*Id.* at 655.)

About two weeks later, Plaintiff was admitted to Jacobi with complaints of substernal chest pressure, dizziness, and shortness of breath while at rest.  (*Id.* at 446.)  Plaintiff indicated that he had not had this type of pain since before his stents were placed.  (*Id.*)  Plaintiff underwent a chest X-ray (*id.* at 443), hemostasis, left heart catheterization, and left and right coronary angiographies (*id.* at 440).  Plaintiff was also supposed to undergo a stress test, but "he decided he wanted to leave due to work issues," despite being advised that he needed to take the test in accordance with his cardiologist's recommendation.  (*Id.* at 446; *see also id.* at 644.)[22] Plaintiff was discharged with "no limitations or restrictions" on his activity.  (*Id.* at 446-47.)

At the end of December 2012, Plaintiff visited Dr. Das with complaints of "intermittent chest 'shocks' roughly twice a month," chest pressure upon exertion and at rest, and chest pain after walking two blocks or climbing two flights of stairs.  (*Id.* at 643-44.)  Dr. Das reported that

---

[22] At the hearing, the ALJ asked what "work issues" Plaintiff had at that time, given that he stated that he had been unemployed since January 2009.  (*Id.* at 78-80.)  Plaintiff explained that he had "mainly" refused the stress test because it involved a treadmill, and he believed that would have been "too much" for him.  (*Id.* at 79.)  He also stated that he believed that the "work" comment related to the WEP assignments that he completed through the welfare office.  (*Id.* at 79.)

the invasive study conducted at Jacobi "did[] [not] show much change" in Plaintiff's heart condition.  (*Id.* at 644.)

Plaintiff had another appointment with Dr. Das in March 2013, during which he again complained of chest pressure, dizziness, and shortness of breath after walking two blocks or going up one or two flights of stairs.  (*Id.* at 765-66.)  Dr. Das reported that Plaintiff underwent an exercise EKG, which was negative for ischemia.[23]  (*Id.* at 767.)  Dr. Das also noted that Plaintiff showed no signs of congestive heart failure.  (*Id.*)

Plaintiff saw Dr. Das again in May 2013, complaining of largely the same symptoms. (*Id.* at 741-44.)  Plaintiff added that he was experiencing chest pressure associated with stress. (*Id.* at 743.)  Plaintiff also apparently told Dr. Das that he was able to "run [a] mile."  (*Id.*; *see also id.* at 744 ("[Plaintiff] . . . has been having chest pain on walking [a] few blocks[,] but also runs [a] mile").)  The following month, Plaintiff underwent another myocardial perfusion scan, which showed an ejection fraction below normal limits and mild hypokinesia, but did not suggest myocardial ischemia.  (*Id.* at 711-12.)  Plaintiff continued to complain of chest pressure and shortness of breath in September 2013.  (*Id.* at 1042.)

In a November 2013 follow-up appointment at Lincoln, Plaintiff reported to another cardiologist that he had been tolerating his medication, and had not had any episode of chest pressure since his prior visit.  (*Id.* at 1117-18.)  The treatment notes from that appointment reflect "[n]o cardiac complaints" and an assessment of coronary artery disease, status post stenting, "without cardiac symptoms."  (*Id.* at 1119.)  Plaintiff was discharged from Lincoln's cardiac clinic with a note that he "can be followed in medicine clinic."  (*Id.*)

---

[23] Ischemia refers to reduced blood flow to the heart.  *See* http://www.mayoclinic.org/diseases-conditions/myocardial-ischemia/basics/definition/con-20035096 (last accessed Jan. 26, 2017).

### d.   <u>Evidence Related to Bladder Conditions</u>

Plaintiff visited Lincoln's urology department in October 2012, complaining of nocturia. (*Id.* at 661.)  Plaintiff reported to a urologist, Dr. Morgenlander, that he previously had "severe nocturia and frequency," but, at that time was only experiencing nocturia one or two times per night.  (*Id.*)  Plaintiff also stated that he had to strain or press on his lower abdomen in order to void, and only voided once every two days.  (*Id.*)  Dr. Morgenlander ordered a bladder sonogram (*id.*), which showed "a large post void residual" (*id.* at 485), and demonstrated an "inability to void" (*id.* at 658).  Dr. Morgenlander diagnosed Plaintiff with a neurogenic bladder,[24] and, as discussed above, noted that Plaintiff's history and sonogram results pointed in the direction of "diabetic neuropathy of the bladder."  (*Id.*)  Plaintiff underwent a renal ultrasound in December 2012, the results of which caused a Lincoln radiologist to suspect kidney stones.  (*Id.* at 466.)

In January 2013, Plaintiff reported that he began taking Ambien at night, which helped relieve his nocturia.  (*Id.* at 824.)  He still, however, experienced "urinary frequency, hesitancy, straining to urinate, [and] intermittent stream."  (*Id.*)  A cystoscopy[25] revealed that Plaintiff had an enlarged prostate and grade III bladder trabeculations.[26]  (*Id.* at 824-25.)  In February 2013, Dr. Morgenlander diagnosed Plaintiff with benign hypertrophy of the prostate with urinary obstruction and other lower urinary tract symptoms.  (*Id.* at 770.)

---

[24] A neurogenic bladder is a condition "in which a person lacks bladder control due to a brain, spinal cord, or nerve condition."  https://medlineplus.gov/ency/article/000754.htm (last accessed Jan. 26, 2017).

[25] A cystoscopy is a procedure in which a tube equipped with a lens is inserted into the urethra in order to allow a doctor to examine the lining of the bladder and the urethra.  *See* http://www.mayoclinic.org/tests-procedures/cystoscopy/basics/definition/prc-20013535 (last accessed Jan. 26, 2017).

[26] "Trabeculation is the occurrence of trabeculae, or a meshwork of spongy bone, in the walls of an organ or part."  *Hill v. Astrue*, No. 12cv56 (DDN), 2013 WL 4054688, at *4, n.10 (E.D. Mo. Aug. 12, 2013) (citing *Stedman's Medical Dictionary*, at 413660).

Plaintiff had a follow-up appointment with Dr. Morgenlander in April 2013. (*Id.* at 757.) At that time, Dr. Morgenlander noted that Plaintiff had "significant" lower urinary tract symptoms and showed "minimal improvement" in his symptoms. (*Id.*) Following Plaintiff's June 2013 appointment, Dr. Morgenlander reported that Plaintiff urinated with "significant frequency" and that his nocturia had not improved. (*Id.*) In September 2013, Plaintiff complained to Dr. Morgenlander that he had to push on his lower bladder in order to urinate and did not "feel the urge to urinate at all." (*Id.* at 1289.) Following that appointment, on October 31, 2013, Plaintiff underwent another cystoscopy and a urethral dilation. (*Id.* at 1092, 1128-29.) According to Plaintiff, the dilation resolved his urinary symptoms for five days, after which his symptoms recurred. (*Id.* at 1120.)

In January 2014, Plaintiff underwent a cystometrogram,[27] which showed a "large capacity bladder with possible dsd [detrusor sphincter dyssynergia]."[28] (*Id.* at 1133-34.) He was advised to increase Flomax usage to twice a day and was scheduled for a follow-up appointment. (*Id.* at 1134.)

### e.     Evidence Related to Bowel Incontinence and Constipation

In June 2012, Dr. Takeshige referred Plaintiff to Lincoln's proctology department for bowel incontinence, from which Plaintiff had reportedly suffered for "many years" before that date. (*Id.* at 621.) Plaintiff told the examining physician, Dr. Irizarry, that he took Ducolax and

---

[27] A cystometrogram is test used to assess how one's bladder and sphincter behave while storing and passing urine. *See* http://www.med.umich.edu/1libr/urology/cystometrogram.htm (last accessed Jan. 26, 2017).

[28] "Detrusor sphincter dyssynergia (DSD) is the urodynamic description of bladder outlet obstruction from detrusor muscle contraction and concomitant involuntary urethral sphincter activation."  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4739973/ (last accessed Jan. 26, 2017).

Lactulose, two types of laxatives,[29] daily, for "bowel prep."  (*Id.*)  He also stated that "he only

ha[d] difficulty holding his stool when he [took] [L]actulose[,] which he [did] regularly," and

that, without laxatives, he had a bowel movement once every three-to-four days.  (*Id.* at 622-23.)

Dr. Irizarry advised Plaintiff to stop taking Ducloax and Lactulose, to eat three meals a day, to

increase his fiber intake, and to use suppositories until his bowel movements became

"normalized."  (*Id.* at 621, 623.)  Dr. Irizarry also noted her impression that Plaintiff had engaged

in "laxative abuse."  (*Id.* at 622.)  Although scheduled, no barium enema[30] was performed "due

to poor prep" on Plaintiff's part.  (*Id.* at 621.)

     Dr. Irizarry examined Plaintiff again in October 2012 for complaints of chronic

constipation and bowel incontinence.  (*Id.* at 587.)  She noted that Plaintiff had reported

incontinence after taking laxatives, and that he had been "told previously to stop abusing

laxatives."  (*Id.*)  A preliminary radiograph of Plaintiff's abdomen was taken, showing an

"[u]nremarkable bowel gas pattern," and "[a] large amount of residual stool" in Plaintiff's colon.

(*Id.* at 486.)  A barium enema was again not performed due to "insufficient bowel prep" by

Plaintiff.  (*Id.*)

     Dr. Irizarry examined Plaintiff for continued complaints of chronic constipation in

April 2013, and scheduled him for a colonoscopy.  (*Id.* at 753.)  The colonoscopy did not occur

until March 2014 (*id.* at 1190-91), however, as Plaintiff did not have anyone to accompany him

to the procedure on the previously scheduled dates (*id.* at 1143).  After the colonoscopy, Plaintiff

---

[29] *See* http://www.mayoclinic.org/drugs-supplements/laxative-oral-route/description/drg-20070683; https://medlineplus.gov/druginfo/meds/a682338.html (last accessed Jan. 26, 2017).

[30] "A barium enema is an x-ray exam that can detect changes or abnormalities in the large intestine."  http://www.mayoclinic.org/tests-procedures/barium-enema/basics/definition/prc-20019174 (last accessed Jan. 26, 2017).

was diagnosed with "[d]iabetic [n]europathy with slow transit constipation and mixed incontinence." (*Id.* at 1190-91.)  Plaintiff was prescribed additional laxatives, with the goal of at least two-to-three bowel movements per week. (*Id.* at 1191.)  The physician who prescribed these medications noted, though, that they could have the effect of "exacerbate[ing] fecal incontinence." (*Id.*)

### f.   Evidence Related to GERD

In December 2012, Plaintiff visited the ENT (ears, nose, and throat) department at Lincoln with complaints of difficulty in swallowing. (*Id.* at 647.)  Plaintiff underwent a fiberoptic direct laryngoscopy,[31] and was diagnosed with gastroesophageal reflux disease (GERD)[32] and dysphagia.[33] (*Id.* at 647-49.)

The following year, in December 2013, Plaintiff again visited the ENT department, complaining of difficulty in swallowing. (*Id.* at 1112.)  Plaintiff reported that he "[i]ntermittently" experienced "panic attacks," in which he felt "like his throat [was] closing," and which caused him to "pass[] out." (*Id.*)  Plaintiff also stated at his appointment that "he [could] not eat anything because of his swallowing problem." (*Id.*)  His examining physician, however, noted that Plaintiff had not lost any weight since his visit the year before. (*Id.*)

---

[31] A fiberoptic laryngoscopy is a procedure for examining the back of one's throat through the use of a small flexible telescope. *See* https://medlineplus.gov/ency/article/007507.htm (last accessed Jan. 26, 2017).

[32] "Gastroesophageal reflux disease (GERD) is a condition in which the stomach contents leak backwards from the stomach into the esophagus." https://medlineplus.gov/ency/article/000265.htm (last accessed Jan. 26, 2017).

[33] "Difficulty swallowing (dysphagia) means it takes more time and effort to move food or liquid from your mouth to your stomach."  http://www.mayoclinic.org/diseases-conditions/dysphagia/basics/definition/con-20033444 (last accessed Jan. 26, 2017).

Another fiberoptic direct laryngoscopy was performed, and the examining physician found "mild edema and erythema suggesting laryngopharyngeal ref[lu]x."[34]  (*Id.* at 1112-14.)

Plaintiff was seen for a follow-up appointment in January 2014 in the ENT department. (*Id.* at 1131.)  He reported that he was "doing much better" on Zantac and Prevacid, and that his diet changes had also helped him.  (*Id.*)

### g.  Evidence Related to Depression and Anxiety

In May 2012, Plaintiff reported to his cardiologist that he was depressed, but denied any suicidal ideations at that time.  (*Id.* at 527, 567.)  In October 2012, Plaintiff took a PHQ9 test with Dr. Takeshige.  (*Id.* at 638, 640.)  His score suggested severe depression, and he was referred to a psychiatrist.  (*Id.* at 640.)

In March 2013, Plaintiff began receiving treatment at Fedcap Rehabilitation Services ("Fedcap") from Dr. Robotti, a psychiatrist.  (*Id.* at 1000-07.)  Plaintiff's chief complaints to Dr. Robotti at the time were insomnia, for which he was receiving treatment at a sleep clinic, and anxiety regarding his "extensive medical problems."  (*Id.* at 1006.)  Plaintiff reported that he had never taken any psychotropic medications except for Lunesta, which had been prescribed for him by a doctor at a sleep-disorder clinic.  (*Id.*)  He also reported that he had not had any suicidal ideations in the prior 90 days.  (*Id.* at 1003.)  Dr. Robotti noted in a psychiatric assessment form that Plaintiff "worrie[d] a lot about his medical problems" and tended to focus on them "in an obsessive manner," such that "his life appear[ed] to be centered around them."  (*Id.* at 1001-02.) She diagnosed him with an anxiety disorder due to his multiple medical conditions and assigned

---

[34] Laryngopharyngeal reflux (LPR) occurs when "the contents of the stomach and upper digestive tract . . . reflux all the way up the esophagus . . . and into the back of the throat and possibly the back of the nasal airway."  http://www.entnet.org/content/gerd-and-lpr (last accessed Jan. 26, 2017).

him a Global Assessment of Functioning ("GAF") rating of 65.[35]  (*Id.* at 1005-06.)  She

recommended individual therapy as treatment.  (*Id.* at 1007.)

     Plaintiff had another appointment at Fedcap in June 2013 with Dr. Pell, a different

psychiatrist.  (*Id.* at 1008-13.)  Dr. Pell noted that Plaintiff had made "minimal progress" since

his last appointment.  (*Id.* at 1008.)  Dr. Pell further reported that Plaintiff "ha[d] difficulty

engaging in daily activity" and "experience[d] episodes of anxiety due to various medical

conditions."  (*Id.* at 1010, 1012.)  Dr. Pell set various goals for Plaintiff regarding his mood,

medication compliance, and social relationships.  (*Id.* at 1011-12.)

     Plaintiff met again with Dr. Robotti in September 2013 and with Dr. Pell in

December 2013.  (*Id.* at 1021-38.)  The records provided for these appointments do not reflect

any changes in Plaintiff's diagnoses, progress, or treatment goals.  (*See id.*)

     **3.**    **Evidence From the Date of Plaintiff's Benefits
Applications Through the Date of the ALJ's Opinion
(February 26, 2014 – May 15, 2015)**

     **a.**    **Evidence from Treating Sources**

     **i.**    **Treatment Notes**

     Plaintiff visited Lincoln again on February 28, 2014, complaining of 5/10 pain in his right

shoulder.  (*Id.* at 1163.)  He informed the examining physician that he was not taking any pain

---

[35] The GAF scale, ranging from 0 to 100, may be used to report a clinician's judgment of
an individual's overall level of functioning.  *See* American Psychiatric Association, *Diagnostic
and Statistical Manual of Mental Disorders*, at 32 (4th ed. rev. 2000) ("DSM-IV").  A GAF of
61 to 70 represents "some mild symptoms or some difficulty in social, occupational, or school
functioning, but generally functioning pretty well, has some meaningful interpersonal
relationships."  *Id.* at 34.  The most recent (2013) edition of the DSM, however, "has dropped the
use of the [GAF] scale."  *Restuccia v. Colvin*, No. 13cv3294 (RMB), 2014 WL 4739318, at *8
(S.D.N.Y. Sept. 22, 2014) (quoting *Mainella v. Colvin*, No. 13cv2453 (JG), 2014 WL 183957, at
*5 (E.D.N.Y. Jan. 14, 2014)).

medications and declined a steroidal injection.  (*Id.*)  He was prescribed an electrical heating pad, advised to continue his home exercise program, and discharged home to his usual activities.  (*Id.*)

Plaintiff also continued to receive psychiatric treatment at Fedcap between March 2014 and either June or August 2014,[36] with Dr. Pell and a social worker named Daniel Rodriguez. (*Id.* at 1419-22, 1430-42.)  The treatment notes for these appointments do not reflect any changes in Plaintiff's diagnoses, progress, or treatment goals.  (*Id.*)

In April 2014, Plaintiff complained to a urologist at Lincoln of nocturia four-to-six times per night and burning upon urination.  (*Id.* at 1187.)  The urologist advised Plaintiff that the "[b]est solution at [the] time [was] to improve [diabetes] control," telling Plaintiff that, "[i]f this [were] achieved, nocturia should improve."  (*Id.*)  Later that month, Dr. Takeshige reported that Plaintiff's diabetes was still uncontrolled, but was "better" given his diet.  (*Id.* at 1183.)  Plaintiff was still refusing to check his blood glucose level and take insulin at the time, due to his fear of needles.  (*Id.*)

In July 2014, Plaintiff was admitted to the emergency room at Lincoln, complaining of piece of a peach stuck in his throat.  (*Id.* at 1200-04.)  Doctors did not see any "foreign body" through a direct laryngoscopy or neck/chest X-ray, and discharged him.  (*Id.* at 1206.)  Plaintiff's primary diagnosis was listed as esophageal reflux.  (*Id.* at 1200.)

---

[36] The Record includes a Fedcap "Treatment Plan Review" document that Plaintiff apparently signed and dated August 20, 2014.  (*Id.* at 1441.)  Give, though, that the document itself is dated March 17, 2014 (*id.* at 1436), and that Dr. Pell apparently signed and dated the document March 22, 2014 (*id.* at 1442), it is unclear whether Plaintiff, in fact, had an August 2014 appointment at Fedcap.  If he did not, then the most recent Fedcap appointment documented in the Record appears to have occurred in June 2014.  (*See id.* at 1430-35.)

### ii.     Medical Source Statement of Dr. Takeshige (October 10, 2014)

On October 10, 2014, Plaintiff's primary care physician at Lincoln, Dr. Takeshige, completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" form for Plaintiff.  (*See id.* at 1410-15.)  Dr. Takeshige reported that Plaintiff was able to frequently lift and carry up to 10 pounds, occasionally lift and carry between 11 and 20 pounds, and never lift or carry more than 20 pounds.  (*Id.* at 1410.)  Dr. Takeshige also specified that Plaintiff could only sit, stand, or walk for 15-20 minutes at a time without interruption, and, with respect to each, for four hours total in an eight-hour work day.  (*Id.* at 1411.)  She added that Plaintiff had bladder and fecal incontinence, and "need[ed] to be close[] to [a] bathroom."  (*Id.*)

In terms of Plaintiff's use of his hands, Dr. Takeshige reported that Plaintiff could only occasionally reach, handle, finger, feel, push, or pull with either hand.  (*Id.* at 1412.)  She further noted that he had right shoulder tenderness and that his "PROM (passive range of motion) [was] full [with] mild pain."  (*Id.*)  As to Plaintiff's use of his feet, Dr. Takeshige stated that Plaintiff could only occasionally operate foot controls given his lower back pain, knee pain, and lumbosacral tenderness and spasms.  (*Id.*)  She reported his exercise tolerance as "[two] blocks." (*Id.*)  In addressing postural activities, Dr. Takeshige determined that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, or crawl.  (*Id.* at 1413.)  Dr. Takeshige also opined that none of the above impairments affected Plaintiff's hearing or vision.  (*Id.*)

As far as environmental limitations, Dr. Takeshige stated that Plaintiff could only occasionally tolerate exposure to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold or heat, or vibrations.  (*Id.* at

1414.)  She concluded that he could never operate a motor vehicle due to his Alprazolam[37]

medication.  (*Id.*)

Finally, "based solely on [Plaintiff's] physical impairments," Dr. Takeshige opined that

Plaintiff was able to shop, travel without a companion, ambulate without assistance, "walk a

block at a reasonable pace on rough or uneven surfaces," use public transportation, "climb a few

steps at a reasonable pace with the use of a single hand rail," prepare a simple meal and feed

himself, care for his own personal hygiene, and "sort, handle, or use paper/files."  (*Id.* at 1415.)

**b.**    **Evidence from Examining Consultants**

**i.**    **Consultative Internal Medicine Examination
(Sharon Revan, M.D., June 4, 2014)**

On June 4, 2014, internist Sharon Revan, M.D., conducted a consultative examination of

Plaintiff for purposes of Plaintiff's SSA disability claims.  (*Id.* at 979-83.)  Plaintiff's chief

complaints to Dr. Revan were of constipation, hypertension, diabetes, lower back pain, and

swallowing problems.  (*Id.* at 979.)  Plaintiff reported that he suffered from constipation and

required medication in order to move his bowels.  (*Id.*)  He also stated that his blood pressure

fluctuated and that he experienced chest pressure, palpitations, lower extremity edema, and

shortness of breath either sitting or walking two blocks.  (*Id.*)  Additionally, he reported that he

had had two stents placed after a supposed heart attack in 2012.  (*Id.*)  Moreover, Plaintiff

informed Dr. Revan that he had diabetes, but "d[id] not take finger[]sticks."  (*Id.*)  He reported

suffering from polyuria, nocturia, intermittent numbness and tingling in his hands and feet,

occasional blurred vision, and "damaged" kidneys.  (*Id.*)  As to his lower back pain, he relayed

that he had experienced a "work accident" in 2008 that had injured him, and that he currently

---

[37] Alprazolam is a drug used to treat anxiety.  *See*
https://medlineplus.gov/druginfo/meds/a684001.html (last accessed Jan. 26, 2017)

suffered from a nerve disorder and herniated disc.  (*Id.*)  He reported feeling "intermittent, sharp pain" that worsened upon changing positions, bending, lifting, walking two blocks, sitting, standing, or climbing stairs.  (*Id.*)  He complained that the pain "radiate[d] down his side and then down both legs."  (*Id.*)  He described the pain as 10/10, and stated that nothing, including physical therapy, had helped to alleviate it.  (*Id.*)  Finally, he complained of problems swallowing, but stated that he was able to eat chicken and fish.  (*Id.*)

Separate from these complaints, Plaintiff reported to Dr. Revan that his daily activities included showering, dressing himself, cooking, cleaning, doing laundry, shopping, watching television, listening to the radio, and following up with his doctors.  (*Id.* at 980.)

In conducting a physical examination of Plaintiff, Dr. Revan noted that Plaintiff was wearing a knee brace and a back brace at the time, but that he "appeared to be in no acute distress," had a "normal" gait, could walk on heels and toes and squat halfway, required no help with changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty.  (*Id.* at 981.)

In conducting a musculoskeletal examination of Plaintiff, Dr. Revan reported that Plaintiff experienced lower back pain on palpation, and bilateral knee pain "on ROM."  (*Id.* at 982.)  She noted full range of motion with respect to Plaintiff's shoulders.  (*Id.*)  She also found Plaintiff's hand and finger dexterity to be intact and his grip strength to be 5/5 bilaterally. (*Id.*)

Dr. Revan diagnosed Plaintiff with swallowing problems, constipation, hypertension, diabetes, and lower back pain.  (*Id.* at 982.)  She also opined that Plaintiff had no limitations with his speech, vision, or hearing, and no limitations as to his upper extremities for fine or gross motor activity.  (*Id.*)  She found that he had mild-to-moderate limitations in sitting and walking

"due to shortness of breath," and mild-to-moderate limitations with respect to walking, sitting, standing, and climbing stairs due to his back pain.  (*Id.* at 982.)  Finally, she opined that he had no limitations in terms of personal grooming or in the activities of daily living.  (*Id.*)

Although it is unclear from her report, it appears as if Dr. Revan had access to at least some of Plaintiff's medical records in drawing these conclusions, as her report lists Plaintiff's hospitalizations in 2012 and 2013 – including his stent procedure in 2012 at Bellevue – and 17 of his prescription medications.  (*Id.* at 980.)

### ii.    Consultative Psychiatric Evaluation
### (Arlene Broska, Ph.D., June 4, 2014)

Also on June 4, 2014, psychologist Arlene Broska, Ph.D. conducted a consultative "psychiatric evaluation" of Plaintiff for purposes of Plaintiff's SSA disability claims.  (*Id.* at 975-78.)  In meeting with Dr. Broska, Plaintiff denied any present suicidal or homicidal ideations.  (*Id.* at 976.)  Plaintiff also stated that he saw a psychiatrist once a month and therapist once a week, both at Fedcap.  (*Id.* at 975.)  He complained of daily anxiety, including the fear that he was going to "die by choking to death."  (*Id.* at 976.)  Specifically, he reported "severe" anxiety attacks approximately twice per month, lasting up to half an hour.  (*Id.*)  He did state, however, that his medication, which is not specified in the report, had been helping him.  (*Id.*)  In terms of daily activities, Plaintiff reported being able to dress, bathe, and groom himself, shower every day, cook three times a week, clean once a week, take his clothes to the laundromat, shop, travel independently on public transportation, watch television, and read.  (*Id.* at 977.)  He stated that he did not socialize with others.  (*Id.*)  In eliciting this information from Plaintiff, Dr. Broska

noted that Plaintiff did not report any symptoms of mania or thought disorder, or any cognitive problems.  (*Id.* at 976.)

In conducting a "mental status examination" of Plaintiff, Dr. Broska determined, *inter alia*, that Plaintiff was cooperative in demeanor and responsiveness to questions; "[h]is manner of relating, social skills, and overall presentation were adequate"; he spoke intelligibly; his thought processes were coherent; his attention, concentration, and recent and remote memory skills were "intact"; and he displayed "good" insight and judgment.  (*Id.* at 976-77.)

Dr. Broska ultimately diagnosed Plaintiff with a panic disorder and rated his prognosis as "fair."  (*Id.* at 978.)  She concluded that,

> [v]ocationally, there is no evidence of psychiatric limitation in [Plaintiff's] ability to follow and understand simple directions and instructions, perform simple or complex tasks independently, maintain attention and concentration, learn new tasks, maintain a regular schedule, make appropriate decisions, or relate adequately with others.

(*Id.*)  She added, however, that she observed evidence of "mild to moderate limitations at times in [Plaintiff's] ability to appropriately deal with stress."  (*Id.*)  She also reported that, although the results of her examination "appear[ed] to be consistent with psychiatric problems," those problems did "not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis."  (*Id.*)

### iii.        Evidence from Non-Examining Consultant (S. Bhutwala, Ph.D., July 17, 2014)

Consultant S. Bhutwala, Ph.D., also offered an opinion as to Plaintiff's limitations in work-related functioning.  (*See id.* at 113-15, 984-85.)  Dr. Bhutwala's specialty is not noted in the Record or the ALJ's opinion.  Moreover, although this is not clear from the Record or from Dr. Bhutwala's statements themselves, the ALJ states in her opinion that Dr. Bhutwala neither conducted an in-person evaluation of Plaintiff nor had access to "the complete record available at

the [October 29, 2014] hearing." (*Id.* at 24.)  Nevertheless, based on his "access to the medical

evidence present when his opinion was offered" on July 17, 2014 (*id.*), Dr. Bhutwala opined that

Plaintiff only suffered from "mild" restrictions on his activities of daily living, and "non-severe"

psychiatric impairments.  (*Id.* at 114, 984-85.)

### C.    **Procedural History**

#### 1.    **Plaintiff's Application for Benefits and Initial Denial**

As discussed above, Plaintiff applied for SSI and SSDI benefits on February 26, 2014,

alleging that he had become disabled as of November 25, 2011, due to diabetes, herniated discs,

arthritis, and a nerve disorder.  (*Id.* at 101, 109, 195.)[38]  His claims were denied on July 17, 2014

(*id.* at 131-36), and, on August 19, 2014, Plaintiff requested a hearing before an ALJ (*id.* at 137).

In his request for a hearing, he stated that he disagreed with the determinations on his claims

because he "continue[d] to suffer from herniated[ ] discs, arthritis[,] [right] shoulder [and left]

knee pain, [a] nerve disorder, [and] heart disease." (*Id.*)

#### 2.    **Administrative Hearing and Decision Denying Benefits**

On October 29, 2014, Plaintiff, represented by attorney Lawrence Mabes, appeared at a

hearing before ALJ Shire, at which Plaintiff and a vocational expert, Andrew Vaughn

("Vaughn"), testified.  (*See id.* at 35-93; *see also id.* at 12.)

##### a.    **Plaintiff's Testimony Regarding His Employment History**

At the hearing, Plaintiff described his employment history.  He explained that, as a "car

parts helper and picker," a position he held from 1994 to 2002 (*see id.* at 196), he fulfilled

written customer orders by collecting and packing car parts from his company's warehouse (*id.*

---

[38] Plaintiff previously applied for SSI and SSDI benefits on January 3, 2012.  (*Id.* at 102.)
His claims were denied, and his request for a hearing was dismissed, however, after he failed to
appear at a scheduled hearing before an ALJ.  (*See id.* at 97-98.)

at 42).  In that position, he was required to lift objects weighing between 20 and 60 pounds.  (*Id.*)

Plaintiff testified that, as a "food packer," a position he held from 2004 to 2005 (*see id.* at 196),

he cleaned a warehouse, packed products into trucks, and set up company merchandise in stores

(*id.* at 42).  In that position, he was required to lift soda bottles weighing approximately 10 to 30

pounds.  (*Id.* at 43.)  Finally, Plaintiff testified that, as a table saw operator, a position he held

from 2005 to 2009, he made doors, closets, and drawers.  (*Id.* at 43-45.)  In that position, he was

required to lift objects weighing approximately five to 30 pounds.  (*Id.* at 44.)  Plaintiff also

testified that, despite the injury that he suffered on the job in 2008, he continued working at the

same job until he was let go in January 2009 "due to lack of work."  (*Id.* at 44.)  In responding to

questions regarding how he got along with his coworkers, Plaintiff testified that he never had

problems at work and was never disciplined.  (*Id.* at 45-46.)

 Plaintiff further testified that, after being let go as a table saw operator, he continued to

look for work.  (*Id.* at 46.)  He asserted that, as he was unable "to do any lifting, bending, or

anything in that area," he focused his job search on clerical work.  (*Id.*)  He reported that he was

not successful in finding employment, but did perform clerical Work Experience Program

("WEP") assignments for several months in 2014, in exchange for welfare checks.  (*Id.* at 46-

47.)[39]  He performed this work at a police precinct and at Fordham Plaza in the Bronx.  (*Id.* at 25,

46-47.)  According to Plaintiff, he worked at the police precinct from between 9:00 a.m. and

2:00 p.m. or 3:00 p.m., three days per week, and completed tasks such as organizing documents

alphabetically.  (*Id.* at 47.)  He stated that he was not terminated from this position, but rather

transitioned to Fordham Plaza after the precinct no longer needed him.  (*Id.* at 50.)  At Fordham

---

[39] Although his testimony is unclear, Plaintiff may have also performed WEP assignments in late 2012.  (*See id.* at 79.)

Plaza, he worked "about the same" amount of time as he had at the precinct, and performed tasks such as making copies, organizing paperwork, and shredding documents.  (*Id.* at 48-50.)  While shredding paper, he would sit for 15 to 20 minutes at a time, but would then need to "get up because of [his] back condition," "nerve disorder," and "dislocated disc."  (*Id.* at 49.)  He would then stand for approximately 30 minutes, and alternate between sitting and standing for the entire workday.  (*Id.* at 53.)  He reported that he was able to control his frequent need to go to the bathroom while working in these locations by limiting the intake of his medication.  (*Id.* at 74, 76.)

Plaintiff further testified that his welfare office had required him to look for work during the other two days of the workweek.  (*Id.* at 50-51.)  He stated that he complied with this requirement, and "would go to stores and ask . . . for clerical work."  (*Id.*)

According to Plaintiff, in mid-2014, he provided his welfare office with paperwork from his primary care physician, and was excused from having to perform further WEP assignments "based on . . . the severity of [his] case."  (*Id.* at 46, 51.)

#### b.      Plaintiff's Testimony Regarding His Daily Activities

In terms of his daily activities, Plaintiff testified that he lived alone, and that he cooked, cleaned, and shopped for himself, "[r]egardless of how painful[] it [was]," and whether he "[got] dizzy or not."  (*Id.* at 54, 73.)  He stated that, when grocery shopping, he was able to grab, lift, and carry home "two bags" of food, weighing "[j]ust about 20 pounds."  (*Id.* at 55.)  He also testified that he was able to walk two blocks before needing to rest, and could also walk up two flights of stairs before needing to rest.  (*Id.* at 54-55.)

c. **Plaintiff's Testimony Regarding**
   <u>**His Physical and Mental Impairments**</u>

Plaintiff also testified regarding his various physical and mental ailments and limitations. He reported being right-handed and having problems with his right shoulder. (*Id.* at 56-57.) He stated that he was able to reach overhead with a "bit of difficulty" and "some pain," and reach forward without much difficulty. (*Id.* at 57.) Additionally, Plaintiff asserted that he experienced "a little" shortness of breath whenever he lifted his left hand. (*Id.* at 57-58.) He also reported that he experienced numbness and tingling in his hands, which affected his index fingers and made it "a little bit difficult" to grab items. (*Id.* at 75.) He added that he could "easily move the other fingers," but that, when he did so, "they hurt a little bit." (*Id.*) Plaintiff further testified that he experienced swelling in his legs when his back pain became severe. (*Id.* at 72.) He also testified that he had heart issues and had experienced four "episodes" for which he had needed to take nitroglycerin. (*Id.* at 58-60.)

Apart from these ailments, Plaintiff stated that he suffered from constipation and took Lactulose to treat it. (*Id.* at 66-67.) He claimed that, as a result of this medication, he went to the bathroom up to seven times a day for between five and 45 minutes at a time. (*Id.* at 76.) He informed the ALJ that, in order for him to appear at the hearing, he had to refrain from taking Lactulose or any other medication to treat his constipation for the entire day prior to the hearing. (*Id.* at 67.) Plaintiff also stated that, despite having had prostate surgery and taking sleeping medication, he woke up to urinate four times per night. (*Id.* at 68.)

Additionally, Plaintiff testified that he experienced panic attacks. He stated that he had difficulty swallowing due to "acid reflux," which was followed by difficulty in breathing, which, in turn, caused his panic attacks. (*Id.* at 60-61.) According to Plaintiff, these panic attacks occurred once or twice a week, caused light-headedness, and immobilized him for about five

minutes.  (*Id.* at 62-63.)  Plaintiff testified that the attacks then lasted for another 15 minutes, and

that the effects of the attacks would "linger[] for about three days," during which time he would

feel "scared."  (*Id.* at 63.)  Plaintiff also stated that, due to his "anxiety and panic attack[s]," he

did not use needles to check his blood sugar, despite being diabetic.  (*Id.* at 69.)  To obtain

treatment for his anxiety, Plaintiff stated that he saw a psychiatrist once a month and a

psychologist once a week.  (*Id.* at 63-64, 71-72.)  He also stated that he took the generic version

of the drug Xanax, which he claimed did "[not] help too much," but provided him with "a little

bit of relief" and caused him to feel "somewhat well."  (*Id.* at 65.)

### d.      **Vocational Expert's Testimony**

At the close of the hearing, the ALJ questioned Vaughn, the vocational expert, as to

whether there were jobs that a hypothetical individual could perform, if that individual:  (1) were

limited to light or sedentary work; (2) could only sit, stand, and walk for four hours each per day;

(3) required the option to sit or stand at his workstation and the ability to take one-to-two

minutes to change positions every 30 minutes; (4) would need to be permitted ready access to a

bathroom; (5) would need to be permitted to work at his own pace with a set amount of work to

be completed by the end of the day; (6) could only socialize with coworkers, supervisors, and the

general public occasionally; (7) could not reach overhead with his right, dominant, upper

extremity; (8) could occasionally use foot controls to push or pull; (9) could occasionally

balance, climb, stoop, kneel, crouch, and crawl; and (10) could only occasionally tolerate

changes in the workplace.  (*Id.* at 83-86.)

In response, Vaughn identified three jobs in the national economy that an individual with

these limitations could perform:  assembler for small products (DOT number 739.687-030); lens

inserter (DOT number 713.687-026); and addressing clerk (DOT number 209.587-010).  (*Id.* at

88-90.)  Vaughn stated that these jobs were sedentary in nature, allowed for a "sit/stand option," involved tasks only between the "shoulder height to waist height," and did not involve public contact.  (*Id.* at 88.)  He noted that the DOT did not specify that these jobs provided for a sit/stand option, but that he had determined that they entailed such an option "based on observation and professional assessments."  (*Id.* at 92.)  Vaughn also noted that, while the DOT listed the small parts assembler job as "light," rather than "sedentary," he had conducted interviews and work evaluations revealing that people had performed this type of job "primarily as a sedentary job."  (*Id.* at 89.)

The ALJ then added the further limitation that the hypothetical individual would have unscheduled panic attacks lasting 20 minutes, two times per week.  (*Id.* at 90.)  When asked whether that additional limitation would change his conclusions, Vaughn initially stated that being "off task 20 minutes one to two times a week would not necessarily be considered excessive in a collective sense," but that it is "also in that sort of gray area where you're off task unexpectedly for 20 minutes."  (*Id.* at 91.)  Upon further questioning, though, Vaughn clarified that, for a job where the worker would be finishing the work at his "own pace" (as opposed to at a "machine pace"), such time off task would not be "problematic."  (*Id.*)  The ALJ also inquired as to whether an individual would be able to maintain employment if he needed to go to the bathroom five times a day for 10 minutes, on average, at a time.  (*Id.*)  Vaughn responded that "that level of interruption . . . would be disruptive[,] and competitive employment would be hard to maintain."  (*Id.*)  Finally, the ALJ asked whether an individual who could only concentrate occasionally would be able to maintain the three jobs Vaughn described.  (*Id.* at 92.)  Vaughn responded that the three jobs "would not be sustainable with occasional concentration."  (*Id.*)

On May 15, 2015, the ALJ denied Plaintiff's applications for SSDI and SSI benefits, relying in part on Vaughn's testimony that someone with the limitations that were included in the ALJ's initial hypothetical questions at the hearing could perform the jobs of assembler for small products, lens inserter, and addressing clerk.  (*Id.* at 27-28.)  The ALJ's decision, including his RFC determination, is discussed in detail in Section II, *infra*.

### 3.   Plaintiff's Request for Review by the Appeals Council

On June 12, 2015, Plaintiff filed a request with the Appeals Council for review of the ALJ's decision, on the ground that "new information" showed that he could not digest food, and that, if he were to eat, he would "need to be in the bathroom too long."  (*Id.* at 8.)  On July 29, 2015, the Appeals Council denied Plaintiff's request for review.  (*Id.* at 1-5.)  The notice of denial stated that the Appeals Council had reviewed the additional evidence that Plaintiff had provided, but found that the "information [did] not provide a basis for changing the [ALJ's] decision."  (*Id.* at 2, 5.)[40]

### 4.   The Current Action and the Motion Before the Court

Plaintiff filed a form Complaint in this action on August 12, 2015 (*see* Complaint, dated Aug. 7, 2015 ("Compl.") (Dkt. 2)), along with a request to proceed *in forma pauperis* (*see* Dkt. 1), which was granted (*see* Dkt. 3).  In his Complaint, Plaintiff maintains that he is entitled to SSDI and SSI benefits because he suffers from "diabetes, herniated dis[c], nerve disorder, left

---

[40] The additional evidence, which the Appeals Council added to the Record (*id.* at 5), consisted of a hand-written letter from Plaintiff, in which he stated, *inter alia*, that he will donate his organs to the State when he dies (*id.* at 259), and general information regarding (1) gastroparesis (*id.* at 260-66) and (2) the procedure of an upper gastrointestinal endoscopy (*id.* at 1449-50), *i.e.*, a procedure for diagnosing gastroparesis, *see* http://www.mayoclinic.org/diseases-conditions/gastroparesis/basics/tests-diagnosis/con-20023971 (last accessed Jan. 26, 2017).  To the extent Plaintiff meant to assert to the Appeals Council that the "new information" was that he suffered from gastroparesis, his diagnosis of gastroparesis was already part of the Record before the ALJ.  (*See* R. at 1295-96.)

knee pain, heart problems, bladder, [and] digestion."  (Compl. ¶ 4.)  He claims, without

elaboration, that the ALJ's decision was "erroneous, not supported by substantial evidence on the

record, and/or contrary to the law."  (*Id.* ¶ 9.)

By Order dated August 17, 2015, Defendant was directed to file any motion for judgment

on the pleadings within 90 days of filing a notice of appearance, and Plaintiff was directed to file

an opposition, and, if he wished, a cross-motion, no later than 30 days after Defendant's filing of

a motion.  (*See* Dkt. 5.)  Defendant timely filed a motion for judgment on the pleadings on

January 15, 2016 (*see* Dkt. 11; *see also* Dkt. 12 (Memorandum of Law in Support of the

Commissioner's Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), dated

Jan. 15, 2016 ("Def. Mem."))), which the Honorable Alison J. Nathan, U.S.D.J., referred to me

for a report and recommendation (Dkt. 13).  Plaintiff's time to oppose Defendant's motion and to

cross-move for judgment on the pleadings in his favor expired on February 15, 2016, and the

Court did not receive any submissions from Plaintiff by that date.  By Order dated April 1, 2016,

this Court *sua sponte* extended Plaintiff's time to file his opposition to Defendant's motion to

April 29, 2016.  (Dkt. 14.)

As further explained in an Order dated July 14, 2016 (Dkt. 18), Plaintiff filed a document

on April 29, 2016, titled Affirmation in Opposition to Motion (Dkt. 16 ("Pl. Opp.")), but that

submission was mistakenly docketed as a Complaint in a new action.  Having not received any

submission by Plaintiff in *this* action responding to Defendant's motion, this Court issued an

Order to Show Cause, dated June 28, 2016, directing Plaintiff to write to this Court no later than

July 15, 2016 to show cause why his case should not be dismissed without prejudice for failure

to prosecute.  (Dkt. 15)  Plaintiff informed the Clerk of Court of its docketing error by letter

dated July 8, 2016.  (Dkt. 17.)  After the Clerk of Court corrected the error and docketed

Plaintiff's opposition in this action (*see* Dkt. 16), this Court issued an Order dated July 14, 2016,

stating that it would not recommend dismissal for failure to prosecute and that Defendant should

file a reply to Plaintiff's opposition, if any, no later than July 22, 2016 (Dkt. 18).  By letter dated

July 22, 2016, Defendant informed the Court that it did not intend to file any reply.  (Dkt. 19.)

## DISCUSSION

### I.   APPLICABLE LEGAL STANDARDS

#### A.   Standard of Review

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes

'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC),

2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*,

901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by

considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*,

842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's

decision is final, provided that the correct legal standards are applied and findings of fact are

supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131

(2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition

of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of

the administrative agency by simply deferring to the factual findings of the ALJ."  *Pollard v.*

*Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112

(2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied

the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v.*

*Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence. *See Tejada*, 167 F.3d at 773. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). In making this determination, a court must consider the underlying record. The reviewing court does not, however, decide *de novo* whether a claimant is disabled. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997). Thus, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

## B.    The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work,

40

but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Throughout the inquiry, the ALJ must consider four primary sources of evidence:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities.  *Id.* §§ 404.1520(a)(4)(ii), (c); 416.920(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id*.

Where the plaintiff alleges a mental impairment, steps two and three require the ALJ to apply a "special technique," outlined in 20 C.F.R. §§ 404.1520a and 416.920a, to determine the

severity of the claimant's impairment at step two, and to determine whether the impairment

satisfies Social Security regulations at step three.  *See Kohler v. Astrue*, 546 F.3d 260, 265

(2d Cir. 2008).  If the claimant is found to have a "medically determinable mental impairment,"

the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the

presence of the impairment(s)," then "rate the degree of functional limitation resulting from the

impairment(s) in accordance with paragraph (c) of [Sections 404.1520a and 416.920a]," which

specifies four broad functional areas:  (1) activities of daily living; (2) social functioning; (3)

concentration, persistence or pace; and (4) episodes of decompensation.[41]  20 C.F.R.

§§ 404.1520a(b)(2), (c)(3); 416.920a(b)(2), (c)(3); *see Kohler*, 546 F.3d at 265.  The functional

limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate,

marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated

on a four-point scale of "[n]one," "one or two," "three," or "four or more."  20 C.F.R.

§§ 404.1520a(c)(4), 416.920a(c)(4).

        If the claimant's impairment does not meet or equal a listed impairment, then the ALJ

must determine, based on all the relevant evidence in the record, the claimant's residual

functional capacity ("RFC"), or ability to perform physical and mental work activities on a

sustained basis.  *Id.* §§ 404.1545, 416.945.  The ALJ then proceeds to the fourth step of the

inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to

perform his or her "past relevant work."  *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if

the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to

---

[41] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

determine whether, in light of the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), (g); 416.920(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467 (citation omitted).  At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).  The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors.  20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Grids").  Where, however, the claimant suffers from nonexertional impairments (such as mental impairments) that "'significantly limit the range of work permitted by his [or her] exertional limitations,'" the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published Grids.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (citations omitted)).  "A nonexertional impairment 'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'"  *Id.* at 410-11 (quoting *Bapp*, 802 F.2d at 605-06).

C.    **Duty to Develop the Record**

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*,

77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d

751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v.

Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  "[W]here there are deficiencies in the record, an

ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the

claimant is represented by counsel.'"  *Id.* at 79 (quoting *Perez*, 77 F.3d at 47).  The SSA

regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will
> develop your complete medical history . . . [and] will make every
> reasonable effort to help you get medical reports from your own
> medical sources when you give us permission to request the
> reports. . . .  'Every reasonable effort' means that we will make an
> initial request for evidence from your medical source and, at any
> time between 10 and 20 calendar days after the initial request, if
> the evidence has not been received, we will make one followup
> request to obtain the medical evidence necessary to make a
> determination.

20 C.F.R. §§ 404.1512(d), (d)(1); 416.912(d), (d)(1).  The regulations further explain that a

claimant's "complete medical history" means the records of his or her "medical source(s)."  *Id*.

§§ 404.1512(d)(2), 416.912(d)(2).  If the information obtained from medical sources is

insufficient to make a disability determination, or if the ALJ is unable to seek clarification from

treating sources, the regulations also provide that the ALJ should ask the claimant to attend one

or more consultative evaluations.  20 C.F.R. §§ 404.1512(e), 404.1517, 416.912(e), 416.917.

Where there are no "obvious gaps" in the record and where the ALJ already "possesses a

complete medical history," the ALJ is "under no obligation to seek additional information in

44

advance of rejecting a benefits claim." *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x

82, 84 (2d Cir. 2015) (summary order) (quoting *Rosa*, 168 F.3d at 79 n.5).

### D.   The Treating Physician Rule

The medical opinion of a treating source as to "the nature and severity of [a claimant's]

impairments" is entitled to "controlling weight," where the opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

"[T]reating source" is defined as the claimant's "own physician, psychologist, or other

acceptable medical source who . . . has provided [the claimant] with medical treatment or

evaluation" and who has had "an ongoing treatment relationship" with him or her.  20 C.F.R.

§§ 404.1502, 416.902.[42]  Treating physicians' opinions are generally accorded deference because

treating physicians "are likely to be the medical professionals most able to provide a detailed,

longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical findings alone or from reports of

individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2),

416.927(c); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).

Where an ALJ determines that a treating physician's opinion is not entitled to

"controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion.

20 C.F.R. §§ 404.1502, 416.927(c)(2).  Failure to "give good reasons" is grounds for remand.

*Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating physician's

---

[42] A medical source who has treated or evaluated the claimant "only a few times" may be
considered a treating source "if the nature and frequency of the treatment or evaluation is typical
for [the claimant's] condition(s)."  20 C.F.R. §§ 404.1502, 416.902.

opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)[43]), including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the consistency of the physician's opinion with the record as a whole; and (5) the specialization of the physician providing the opinion, 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5); *see Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (noting that these five factors "must be considered when the treating physician's opinion is not given controlling weight").

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining sources.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see* Social Security Ruling 96-2p (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's opinion, by contrast, is generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and citation omitted).  This is because consultative examinations "are often brief, are generally performed without benefit or review of the claimant's medical history, and, at best, only give a glimpse of the claimant on a single day.

---

[43] On February 23, 2012, the Commissioner amended 20 C.F.R. §§ 404.1527 and 416.927, by, among other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs (c) through (e).

Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citation omitted).

      **E.**      <u>**Assessment of a Claimant's Credibility**</u>

Assessment of a claimant's credibility with respect to subjective complaints about his or her symptoms or the effect of those symptoms on the claimant's ability to work involves a two-step process. Where a claimant complains that certain symptoms limit his or her capacity to work, the ALJ is required, first, to determine whether the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce" the symptoms alleged. 20 C.F.R. § 416.929(c)(1). Assuming the ALJ finds such an impairment, then the ALJ must take the second step of evaluating the intensity and persistence of the claimant's symptoms. *Id.*; *see also Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010). In doing so, the ALJ must consider all of the available evidence, and must not "reject statements about the intensity and persistence of pain and other symptoms 'solely because the available objective medical evidence does not substantiate [the claimant's] statements.'" *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (quoting 20 C.F.R. § 416.929 (c)(1)). Instead, where the claimant's contentions regarding his or her symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding as to the claimant's credibility, in order to determine the extent to which the claimant's symptoms affect his or her ability to do basic work activities. *Id.*; *see also Meadors*, 370 F. App'x at 183 (citing 20 C.F.R. § 404.1529(c)(3)(i)-

(vii)[44]); *Taylor v. Barnhart*, 83 F. App'x 347, 350-51 (2d Cir. 2003) (summary order); Social

Security Ruling ("SSR") SSR 96-7p (S.S.A. July 2, 1996).[45])

"While an ALJ 'is required to take [a] claimant's reports of pain and other limitations

into account' [in making a credibility determination] . . . he or she is 'not required to accept the

claimant's subjective complaints without question.'" *Campbell v. Astrue*, 465 F. App'x 4, 7

(2d Cir. 2012) (summary order) (quoting *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010)).

"Rather, the ALJ may exercise discretion in weighing the credibility of the claimant's testimony

in light of the other evidence in the record." *Id.*  The ALJ must, however, include "specific

reasons for [his or her] finding on credibility, supported by the evidence in the case record," and

the reasons must make it sufficiently clear for a reviewer to determine "the weight the [ALJ]

gave to the [claimant's] statements and the reasons for that weight."  SSR 96-7p.  The factors

that an ALJ should consider in evaluating the claimant's credibility are:  (1) the claimant's daily

activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating

and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications

---

[44] Although the particular regulation cited in the *Meadors* decision does not apply to SSI claims, a related regulation that does apply to such claims contains the same language. *See* 20 C.F.R. § 416.929(c)(3)(i)-(vii).

[45] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p.  *See* SSR 16-3p, 2016 WL 1237954 (Mar. 28, 2016).  The new ruling eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character."  *Id.* at *1.  Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms."  *Id.* at *2.  Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings.  *Compare* SSR 96-7p *with* SSR 16-3p.  As the ALJ's decision in this matter was issued before the new regulation went into effect, this Court will review the ALJ's credibility assessment under the earlier regulation, SSR 96-7p.

taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms.  *See* 20 C.F.R. § 416.929(c)(3)(i)-(vii).

## II.   THE ALJ'S DECISION

On May 15, 2015, the ALJ issued a decision finding that Plaintiff had not been disabled since his claimed onset date of November 25, 2011.  (*See generally* R. at 12-28.)  In reaching this decision, the ALJ applied the five-step sequential evaluation procedure.

### A.   Steps One Through Three of the Sequential Evaluation

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 25, 2011.  (*Id.* at 14.)  The ALJ clarified that she did not consider Plaintiff's work through the welfare office to be substantial gainful activity.  (*Id.* at 25.)

At step two, the ALJ determined that Plaintiff suffered from the following "severe" impairments:  diabetes mellitus; coronary artery disease, status post placement of two stents; degenerative disc disease of the lumbar spine; right shoulder impingement; degenerative joint disease of the left knee; chronic constipation; benign prostatic hypertrophy; gastroesophageal reflux disease (GERD); depressive disorder; and anxiety disorder.  (*Id.* at 14-15.)  The ALJ also concluded, however, that there was "no objective medical evidence to corroborate" Plaintiff's testimony that he experienced tingling in his index fingers.  (*Id.* at 15.)

At step three, the ALJ found that Plaintiff's impairments, considered "singly or in combination," did not meet or medically equal any impairments in the Listings of 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (*Id.* at 15.)  Specifically, the ALJ determined that the record did not show that Plaintiff's impairments met or medically equaled Listings 1.02 (major dysfunction of a

joint(s)), 1.04 (disorders of the spine), 4.02 (chronic heart failure), 11.14 (peripheral

neuropathies), 12.04 (affective disorders), or 12.06 (anxiety related disorders).  (*Id.* at 15-18.)

In concluding that Plaintiff's conditions did not meet or medically equal the criteria of

Listing 1.02, the ALJ acknowledged that Plaintiff had been diagnosed with a right shoulder

impingement and degenerative joint disease of the left knee, but determined that the Record did

not support a finding that Plaintiff's impairments "resulted in an inability to ambulate

effectively" or that he had "joint dysfunction in each upper extremity," as the listing required.

(*Id.* at 15-16.)

Moreover, in concluding that Plaintiff's mental impairments did not meet or medically

equal the criteria under Listings 12.04 or 12.06, the ALJ determined that the "paragraph B"

criteria of those Listings were not satisfied[46] because Plaintiff had "no restriction in his activities

---

[46] A claimant meets the listing for affective disorders (*i.e.*, Listing 12.04) or anxiety-related disorder (*i.e.*, Listing 12.06), where he or she meets both the "paragraph A" and "paragraph B" criteria, or meets the "paragraph C" criteria of those listings.

To meet the "paragraph B" criteria under either Listing, a claimant would need to demonstrate at least two of the following:  (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration.  The definition of "marked" as it applies to measuring the degree of a limitation means "more than moderate but less than extreme."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C).

To meet the "paragraph C" criteria under Listing 12.04, a claimant would need to demonstrate (1) a medically documented history of chronic affective disorder of at least two years' duration causing more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and (2) one of the following:  (a) repeated episodes of decompensation, each of extended duration; (b) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or a change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  To meet the "paragraph C" criteria under Listing 12.06, a claimant would only

of daily living," had only "moderate difficulties in social functioning," had "only mild difficulties in concentration, persistence, or pace," and "experienced no episodes of decompensation." (*Id.* at 16-17.)  In concluding that Plaintiff was not restricted in his daily activities, the ALJ relied on Plaintiff's own hand-filled form regarding his activities of daily living, Dr. Broska's consultative examination report, Dr. Revan's consultative examination report, Plaintiff's hearing testimony, Fedcap records, and certain Lincoln records, indicating that Plaintiff was "independent in all of his activities of daily living and self-sufficient." (*Id.* at 17.)  In concluding that Plaintiff experienced only "moderate difficulties in social functioning," the ALJ acknowledged that Plaintiff had denied socializing with others and had stated that he lived a "lonely life." (*Id.* at 17.)  Nonetheless, referencing reports from Plaintiff's treating psychiatrist, Dr. Robotti, and consulting psychologist, Dr. Broska, the ALJ found that Plaintiff "presented as pleasant and cooperative and [that] his manner of relating, social skills, and overall presentation were adequate." (*Id.* at 17.)  In determining that Plaintiff only experienced "mild difficulties" as to concentration, persistence, or pace, the ALJ relied on Dr. Robotti's March 2013 report that Plaintiff demonstrated an ability to concentrate, unimpaired memory, and alertness and attention within normal limits. (*Id.* (citing *id.* at 1002).)  The ALJ also relied on Dr. Broska's June 2014 report that Plaintiff's attention, concentration, and memory skills were "intact." (*Id.* (citing *id.* at 977).)

The ALJ further determined that none of the "paragraph C" criteria were satisfied because the Record contained no evidence that Plaintiff suffered from repeated episodes of decompensation, that any "marginal adjustment or minimal increase in mental demands or

---

need to demonstrate that his or her anxiety-related disorder resulted in a complete inability to function independently outside the area of his or her home.

change in the environment would cause decompensation," that Plaintiff had "a current history of one or more years' inability to function outside a highly supportive living arrangement," or that Plaintiff was completely unable to function independently outside the area of his home.  (*Id.* at 17.)

With respect to Listings 1.04, 4.02, and 11.14, the ALJ similarly found that the Record did not contain any evidence to support that the requirements of those listings were met or medically equaled.  (*Id.* at 16.)

### B.    The ALJ's Assessment of Plaintiff's RFC

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, finding that Plaintiff had "the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b),"[47] subject to the following exceptions:

> [H]e is limited to sitting four hours total, standing four hours total, and walking four hours total in an eight-hour workday; must be given ready access to a bathroom; is limited to a job pace that is controlled by the worker's pace, and is not a factory assembly line pace, in which the hypothetical worker can stop and start at his own pace, allowing for an unscheduled trip to the bathroom at the worker[']s pace that would not interfere with the flow of work or interrupt interaction between the worker and coworker or customer (general public); can occasionally socially interact with coworkers, supervisors, and the general public; can never engage in overhead reaching with his right dominant upper extremity; can occasionally use foot controls to push and pull; can occasionally balance, climb, stoop, kneel, crouch, and crawl; will be off-task and unable to concentrate for 20 minutes up to twice a week at unscheduled times; can no more than occasionally tolerate changes in the workplace; and must be permitted to change between sitting and

---

[47] "Light work requires the ability to lift up to 20 pounds occasionally, lift 10 pounds frequently, stand and walk for up to 6 hours a day, and sit for up to two hours a day." *Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) (citing 20 C.F.R. § 404.1567(b); Program Policy Statement, Titles II and XVI: Determining Capability To Do Other Work—The Medical-Vocational Rules of Appendix 2, SSR 83-10).

standing positions every hour taking one to two minutes to change positions.

(R. at 18.)  In making this finding, the ALJ stated that she had "considered all [of Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence."  (*Id.*)

In reaching her RFC determination, the ALJ first reviewed Plaintiff's medical history (*id.* at 19-23) and the existing opinion evidence from Plaintiff's treating and examining sources (*id.* at 23-24).  Her review of Plaintiff's medical history included a detailed, chronological summary of Plaintiff's medical history from 2008 to 2014, setting out the diagnostic tests that Plaintiff had undergone, examination findings by Plaintiff's treaters, and treatment recommendations.  (*Id.* at 19-23.)  Through her summary, the ALJ highlighted records reflecting Plaintiff's non-compliance with certain of his treatment plans (*id.* at 19-20 (refusing to check blood sugar, take insulin, and take certain oral medications), *id.* at 20 (laxative abuse), *id.* (refusing stress test over cardiologist's recommendations)), Plaintiff's admitted improvement with treatment, medication, and changes in diet (*id.* at 20 (noting the disappearance of chest pain at rest following the placement of his stents), 21 (noting improvement in nocturia with Ambien), 22 (noting improvement of GERD with Zantac, Prevacid, and changes in diet, and improvement in diabetes symptoms with changes in diet), 23 (noting improvement in mental health with medication)), and Plaintiff's denial of certain symptoms (*id.* at 19 (indicating that his palpitations were not bothersome), 21 (denying motor-sensory deficits in lower extremities), 22 (denying mood swings, outbursts of anger, suicidal or homicidal ideations, and hallucinations)).

With respect to the opinion evidence, the ALJ stated that she was according "some weight" to the opinion of Plaintiff's primary care physician, Dr. Takeshige; "significant weight" to the opinion of treating physiatrist Dr. Hanan (as expressed through his treatment notes); and

"some weight" to the opinion of treating psychiatrist Dr. Robotti (as expressed through her treatment notes). (*Id.* at 23-24.) The ALJ also considered the opinions of the consulting reviewers, according "some weight" to the opinion of consulting internist Dr. Revan; "significant weight" to the opinion of consulting psychologist Dr. Broska; and "little weight" to the opinion of the non-examining consultant, Dr. Bhutwala. (*Id.*) The ALJ's stated reasons for assigning these weights to these opinions is discussed further *infra*, at Section III(B).

The ALJ also conducted an assessment of Plaintiff's credibility, in connection with making her RFC determination, and found that Plaintiff was not fully credible. First, the ALJ noted Plaintiff's testimony that he was laid off in 2009. (*Id.* at 25.) According to the ALJ, this testimony "suggest[ed] that [Plaintiff] did not work due to an inability to secure employment[,] rather than an incapacity to perform work-related functions." (*Id.*) Second, the ALJ found that Plaintiff's hearing testimony, at times, diverged from what was stated in the clinical notes made by his medical providers. (*Id.*) As one example, the ALJ cited an apparent inconsistency with respect to Plaintiff's description of a prior suicide attempt. (*Id.*) As another example, the ALJ noted that, while Plaintiff claimed that he suffered from "chronic bowel incontinence," one of his treating physicians had instructed him to stop abusing laxatives. (*Id.*) Based on the medical records, the ALJ concluded that Plaintiff's bowel incontinence was "controllable." (*Id.*)

The ALJ further found that Plaintiff's own description of his daily activities was inconsistent with his complaints of allegedly disabling symptoms and limitations. (*Id.*) The ALJ called attention to Plaintiff's own statements that he dressed, bathed, and groomed himself daily, shopped in stores, prepared his own meals, performed limited cleaning and ironing, did laundry, used public transportation, and read for leisure. (*Id.*) Additionally, the ALJ noted Plaintiff's stated ability to control his bowel and bladder symptoms while working at two different WEP

jobs in 2014.  (*Id.*)  While acknowledging that those jobs did not constitute substantial gainful activity, the ALJ found them "indicative of [Plaintiff's] capabilities and the fact that [his] bowel and bladder issues [were] not as limiting as he allege[d]."  (*Id.*)

The ALJ also characterized Plaintiff's treatment as "sporadic and relatively routine and conservative."  (*Id.*)  As to Plaintiff's complaints of diabetes symptoms, such as burning on the soles of his feet and constipation, the ALJ noted Plaintiff's steadfast refusal to test his own blood sugar due to his dislike of needles, and his "significant[]" non-compliance with his diabetes treatment plan.  (*Id.*)  The ALJ also highlighted the absence in the Record of electrodiagnostic testing for neuropathy to support Plaintiff's complaints.  (*Id.*)

Finally, as to Plaintiff's psychiatric symptoms, the ALJ found that Plaintiff's claimed anxiety was not incapacitating given his wide range of daily activities and his supposed refusal "to even consider taking psychiatric medications," except for Xanax, which he admitted was helpful.  (*Id.* at 25-26.)  The ALJ also noted a "dearth of evidence of panic attacks in the treating notes," and called attention to Plaintiff's testimony that, at his worst, he only experienced one or two panic attacks per week, lasting 20 minutes each.  (*Id.* at 26.)

Overall, the ALJ stated that her assessment of Plaintiff's RFC was supported by the longitudinal, objective medical evidence; by Plaintiff's acknowledged daily activities; and by "credible opinions" of both treaters and non-treaters.  (*Id.* at 26.)  According to the ALJ, the evidence before her showed that Plaintiff had "physical conditions that, while limiting, [did] not rise to the level of disabling pain or functional deficits," and that those conditions "[did] not preclude the ability to perform an eroded range of light exertional work activities."  (*Id.*)  The ALJ also concluded that, although the evidence reflected "an individual with significant depressive disorder and anxiety disorder," Plaintiff's psychiatric limitations were "no greater

than moderate." (*Id.*)  She observed that Plaintiff's medical records reflected only "minimal health treatment beginning in February 2013," and that he had demonstrated an ability to perform a wide range of daily activities and to work part-time at two WEP jobs.  (*Id.*) Accordingly, the ALJ determined that the evidence reflected "a level of functioning capable of sustained work with adequate restrictions on interacting with others," which she incorporated into Plaintiff's RFC.  (*Id.*)

### C.      Steps Four and Five of the Sequential Evaluation

At step four of the sequential evaluation, in reliance on Vaughn's testimony, the ALJ found that Plaintiff was not capable of performing "any past relevant work."  (*Id.* at 26.)

At step five, the ALJ concluded that, based on Plaintiff's age, education, work experience, and RFC, Plaintiff was able to perform jobs existing in significant numbers in the national economy.  (*Id.* at 27.)  In making this determination, the ALJ again relied on Vaughn's testimony.  (*Id.*)  In discussing the jobs that Vaughn testified an individual with Plaintiff's RFC could perform, the ALJ noted that Vaughn's testimony regarding those jobs was "inconsistent with the information contained in the [DOT]," in that Vaughn stated that each job could be performed with a sit/stand option, while the DOT did not mention any such option.  (*Id.* at 28.) The ALJ found, however, that there was a "reasonable explanation for the discrepancy," in that the vocational expert's testimony as to the "effects of a sit-stand option on an individual's ability" to perform these jobs was based on his own "observations and special assessments."  (*Id.* at 28; *see also id.* at 92.)  Ultimately, the ALJ concluded that Plaintiff was capable of adjusting to work sufficiently existing in the national economy, and therefore had not been under a disability as defined in the Act from November 25, 2011 through the date of the ALJ's decision, May 15, 2015.  (*Id.* at 28.)

### III.      REVIEW OF THE ALJ'S DECISION

As noted above, Plaintiff alleges in a form Complaint that the ALJ's decision was "erroneous, not supported by substantial evidence on the record, and/or contrary to the law," and contends that he is entitled to receive SSI and/or SSDI benefits due to medical conditions that he claims to be disabling.  (Compl. ¶¶ 4, 9.)  The Commissioner maintains that the ALJ's decision was free from legal error and was supported by substantial evidence.  (*Id.* at 15.)  In particular, the Commissioner contends that the ALJ's RFC determination was supported by substantial evidence, as it accounted for (1) Plaintiff's diabetes, urinary frequency, and bowel incontinence, by including the need for ready access to a bathroom, a worker-controlled pace, and limited social interaction; (2) Plaintiff's heart disease, by restricting him to "light" work; (3) Plaintiff's back, shoulder, and knee pain, by imposing limited standing and sitting time, a sit/stand option, worker-controlled pace, no right-arm overhead reaching, and only occasional kneeling and stooping; and (4) Plaintiff's depression and anxiety, by contemplating only occasional social interaction and workplace changes, a worker-controlled pace, and the ability for Plaintiff to be off-task for two 20-minute periods per week.  (Def. Mem., at 15-16.)

Although Plaintiff filed an Affirmation in Opposition, he did not provide a substantive response to the Commissioner's motion.  (*See* Pl. Opp.)  Instead, he simply stated, in a conclusory manner, that the motion should be denied because "[r]ecords of [his] whole case show that [he] should be given a (yes) in [his] favor."  (*Id.* at 1.)  Plaintiff has not identified any testimony or evidence that he believes that the ALJ has overlooked, failed to request from Plaintiff's providers, or improperly weighed or considered.

While, at times, courts have held that a plaintiff's entirely conclusory allegations will be insufficient to defeat a motion by the Commissioner for judgment on the pleadings, *see, e.g.*,

*DeJesus v. Astrue*, 762 F. Supp. 2d 673, 685-86 (S.D.N.Y. 2011) (collecting cases), this Court, mindful of Plaintiff's *pro se* status and his apparent hesitance to set out his arguments without the benefit of counsel (*see* Pl. Opp., at 2 (stating that he did not have a lawyer and "fe[lt] now like [he was] pleading the 5th not to hurt [his] case")), has nonetheless undertaken a review of the Record and of the ALJ's decision, in order to evaluate the merits of the Commissioner's motion. As the ALJ used the applicable five-step evaluation in analyzing Plaintiff's claims, the questions before this Court are whether, in evaluating Plaintiff's claims under this accepted protocol, the ALJ made any errors of law that might have affected the disposition of the case, and whether her determination that Plaintiff was not disabled was supported by substantial evidence.

### A.   The ALJ Did Not Fail To Satisfy Her Obligation To Develop the Record.

"Whether the ALJ failed to develop the record adequately must be addressed as a threshold issue." *Jackson v. Colvin*, No. 13cv5655 (AJN) (SN), 2014 WL 4695080, at *18 (S.D.N.Y. Sept. 3, 2014). As discussed, the Record in this case is 1,450 pages and includes medical records from several different hospitals from 2008 to 2014. Having reviewed the Record, this Court finds that there are no "obvious gaps" that would warrant remand for further record development. Indeed, the Record contains medical treatment notes from practically every month during the relevant time period.[48]

---

[48] Although there are no records from the sleep-disorder clinic that Plaintiff claims to have visited, SSA files indicate that the SSA requested records from the clinic – specifically, from Mohammad Basit, M.D., Plaintiff's reported treater at the clinic – twice and received no response. (*Id.* at 235-36.) Making one follow-up request is sufficient under SSA regulations. *See* 20 C.F.R. §§ 404.1512(d), (d)(1); 416.12(d), (d)(1). SSA files also indicate that the agency requested records from Montefiore Medical Center ("Montefiore"), and received the response that no records were available. (*Id.* at 235.) This is not surprising or particularly relevant to the

Moreover, although the Record contains only one medical source statement from a treating physician, despite Plaintiff's having seen numerous treaters for various conditions over the relevant time period, remand is not warranted for the ALJ's failure to request additional medical opinions.  *See Monroe v. Comm'r of Soc. Sec.*, No. 16-1042, 2017 WL 213363, at *3 (2d Cir. Jan. 18, 2017) ("Where . . . the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity, . . . a medical source statement or formal medical opinion is not necessarily required." (internal quotation marks and citations omitted)). Significantly, the one medical source statement requested and obtained was authored by Plaintiff's primary care physician, Dr. Takeshige, who began treating Plaintiff in July 2010 (*see id.* at 311-13), and whose treatment notes throughout the Record reflect an awareness and understanding of the full range of Plaintiff's impairments and symptoms.  (*See, e.g., id.* at 1070-73, 1142-45, 1343-46.)

This Court does note that Dr. Takeshige did not opine regarding any limitations caused by Plaintiff's mental-health conditions, but the fact that the ALJ did not seek to obtain a medical source statement from one of Plaintiff's psychiatric treaters is also not a ground for remand. First, Plaintiff has never claimed that his mental health conditions were disabling (*see* Compl. ¶ 4; *see also* R. at 8, 101, 109, 195), and at least some courts have reasoned that an ALJ has no obligation to develop the record as to limitations that are not alleged by a claimant, *see Quinn v. Colvin*, No. 1:15-CV-723 EQW, 2016 WL 4255020, at *10-11 (W.D.N.Y. Aug. 11, 2016) (finding that ALJ was not required to develop the record regarding plaintiff's anxiety, where, while this condition was discussed at the administrative hearing, plaintiff never alleged anxiety

---

question of whether the Record was adequately developed in this case, as Plaintiff only reported visiting Montefiore once in 1999 after a suicide attempt.  (*Id.* at 1006.)

as an impairment).[49]  Second, the Record before the ALJ contained treatment records, including clinical notes, from Plaintiff's mental-health providers through at least June 2014.  (*See* R. at 995-1038, 1417-48.)  Third, despite the fact that Plaintiff had not claimed any mental-health-related disability, the ALJ still took the step of obtaining a psychiatric evaluation report from consultative examiner Dr. Broska (*id.* at 975-78), which, as discussed *infra* at Section III(B)(3), was essentially consistent with Plaintiff's treatment notes.  Finally, the ALJ elicited testimony from Plaintiff, himself, as to his mental-health conditions (including his self-described anxiety attacks), his treatment for those conditions, and any limitations caused by them.  (*Id.* at 61-65.)

Under the circumstances, this Court perceives no legal error with respect to the ALJ's duty to develop the Record.

### B.        The ALJ Did Not Violate the Treating Physician Rule.

As discussed above, the ALJ must "give good reasons" for not according "controlling weight" to a treating physician's opinion, and must "explicitly consider" certain factors under SSA regulations if he or she chooses not to accord such an opinion controlling weight.  (*See supra*, Discussion, at Section I(D).)  Additionally, the opinions of consulting physicians are generally entitled to "little weight," or at least less weight than the opinions of treating physicians.  (*See id.*)  In this case, it appears from the face of the ALJ's decision that she may have violated the treating physician rule, by, *inter alia*, assigning "some weight" to both the opinions of Dr. Takeshige (Plaintiff's treating internist) and Dr. Revan (the consulting internist), without full explanation or discussion of the relevant factors.  (*See* R. at 23-24.)  Close

---

[49] *But see Garcia v. Colvin*, No. 14cv3725 (DF), 2015 WL 5786506, at *20 (S.D.N.Y. Sept. 29, 2015) (holding that "an ALJ who is presented with evidence of a potentially medically determinable impairment must consider that impairment, even if the claimant does not claim the impairment in [his or] her original application for benefits").

examination of the ALJ's decision, however, reveals that, for the most part, the ALJ actually adopted the opinions of Plaintiff's treaters, and, where she did not, her divergence from the treaters' opinions was well supported by the Record and of little, if any, consequence to her disability determination.

      1.      **Weight Given to the Opinion of Plaintiff's Treating Internist, Dr. Takeshige, as Compared to the Weight <u>Given to the Opinion of the Consulting Internist, Dr. Revan</u>**

Although the ALJ stated that she was only assigning the opinion of Dr. Takeshige "some" weight, the ALJ fully incorporated several aspects of that opinion into her RFC determination. Precisely as stated in Dr. Takeshige's opinion, the ALJ's RFC assessment limited Plaintiff to sitting for a total of four hours, standing for a total of four hours, and walking for a total of four hours, in an eight-hour workday. (*Id.* at 18, 1411.) Indeed, the ALJ adopted these exact restrictions, as set out in Dr. Takeshige's opinion, over the less specific restrictions offered by the consultant, Dr. Revan, who merely opined that Plaintiff had "mild to moderate limitations" in his ability to walk, sit, and stand. (*See id.* at 18, 982, 1411.) Additionally, in accordance with Dr. Takeshige's opinion, the ALJ provided, in her RFC determination, that Plaintiff would require ready access to a bathroom at the workplace. (*Id.* at 18, 1411.) The ALJ's RFC determination also provided, as indicated by Dr. Takeshige, that Plaintiff could only occasionally use foot controls, balance, climb, stoop, kneel, crouch, and crawl. (*Id.* at 18, 1412-13.) Finally, while not explicitly part of the ALJ's RFC assessment, the ALJ appears to have adopted Dr. Takeshige's stated views that Plaintiff was able to engage in a wide range of activities of daily living, such as shopping, ambulating without assistance, using public transportation, preparing his own meals, and caring for his own personal hygiene. (*See id.* at 16-

17, 26, 1415.)  Thus, the ALJ effectively assigned controlling weight to multiple portions of Dr. Takeshige's opinion.

The ALJ only appears to have diverged from Dr. Takeshige's opinion with respect to certain ways in which Plaintiff could, or could not, use his shoulders, arms, and hands – specifically, with respect to (a) overhead reaching with Plaintiff's left hand, (b) overhead reaching with Plaintiff's right hand, and (c) non-overhead reaching, handling, feeling, pushing, and pulling with either hand.  None of these differences suggest a violation of the treating physician rule that would warrant remand.

First, while Dr. Takeshige opined that Plaintiff could only occasionally reach overhead with his left hand (*id.* at 1412), the ALJ found no such limitation, noting that the medical records contained "nothing to suggest" it (*id.* at 18).  While it appears that the ALJ may have weighed the opinion of the consultant, Dr. Revan, more heavily than that of Plaintiff's treater on this point (*see id.* at 982 (opinion of Dr. Revan, finding full range of motion in both shoulders)), Plaintiff's treatment records well support the ALJ's finding, and, in any event, it was of no ultimate consequence to the ALJ's ultimate disability determination.  As for the treatment records, Dr. Takeshige's own notes throughout the relevant period only specify complaints by Plaintiff as to his right, as opposed to left, shoulder.  (*See, e.g.*, *id.* at 1345.)[50]  Similarly, and also throughout the relevant time period, Plaintiff only complained to his physiatrist, Dr. Hanan, and his occupational therapist of pain in his right, as opposed to left, shoulder.  (*See, e.g.*, *id.* at 358, 375, 571.)  As to Plaintiff's left upper extremity, both Dr. Hanan and Plaintiff's occupational therapist noted that Plaintiff's active range of motion was within normal limits.  (*See id.* at 350, 1153.)  As

---

[50] In fact, as support for the limitations identified in her opinions, Dr. Takeshige herself only listed "(R) shoulder tenderness," making no specific reference to Plaintiff's left side.  (*Id.* at 1412.)

the opinions of a treating physician "need not be given controlling weight where they are contradicted by other substantial evidence in the record," *Monroe*, 2017 WL 213363, at *1 (citations omitted), the ALJ properly discounted Dr. Takeshige's opinion as to Plaintiff's limitations with respect to his reach overhead with his left hand.  Regardless, the ALJ's determination on this point had no practical impact on her disability determination, as the vocational expert testified that *no* overhead lifting (*i.e.*, with *either* hand) would have been required for any of the three jobs that he identified in his testimony (*id.* at 88) – testimony upon which the ALJ relied in determining that Plaintiff was not disabled.

Second, while Dr. Takeshige opined that Plaintiff could occasionally reach overhead with his right hand (*id.* at 1412), the ALJ actually imposed a *greater* restriction on Plaintiff's abilities in that regard, concluding that Plaintiff could "*never* engage in overhead reaching with his right dominant upper extremity" (*id.* at 18 (emphasis added)).  Not only did the ALJ apparently accord more weight to Dr. Takeshige's opinion in this regard than to that of Dr. Revan (who, as noted above, opined that Plaintiff had a full range of motion in both shoulders), but the ALJ went beyond Dr. Takeshige's view, in favor of a determination that more generously credited Plaintiff's complaints of pain.  While, presumably, Plaintiff would not dispute the ALJ's conclusion that his physical limitations were greater than his treating physician believed them to be, this Court finds that, in any event, the ALJ's conclusion on this point is supported by substantial evidence.  The Record evidences that Plaintiff was diagnosed with a right shoulder impingement, among other right shoulder conditions (*see, e.g.*, *id.* at 596), and Plaintiff testified at the hearing that it was painful to reach overhead with his right hand (*id.* at 57).

Finally, while Dr. Takeshige opined that Plaintiff could only occasionally reach (non-overhead), handle, finger, feel, push, and pull with either hand (*id.* at 1412), the ALJ's RFC

determination contained no such limitations (*id.* at 18).  As to whether Plaintiff had such

limitations, the ALJ apparently accepted the opinion of the consultant, Dr. Revan over that of

Plaintiff's treater, but, upon review of the Record, this Court finds that it was not error to do so.

Significantly, the Record reflects that, throughout the relevant time period and as discussed

above, Plaintiff's complaints and diagnoses as to limitations in either arm or hand related only to

his right shoulder.  Further Dr. Revan specifically reported that Plaintiff's hand and finger

dexterity were "intact," and that his grip strength was "5/5 bilaterally" (*id.* at 982), providing

affirmative evidence as to Plaintiff's fine motor abilities, capable of supporting the ALJ's

determination on this point, *see Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) ("It

is well-settled that a consulting physician's opinion can constitute substantial evidence

supporting an ALJ's conclusions." (collecting cases)).  In any event, Plaintiff himself testified at

the hearing that he could grab, lift, and carry "two bags" of groceries weighing "just about 20

pounds" when he shopped (R. at 55); that it was "not too difficult" for him to reach forward (*id.*

at 57); and that it was only "a little bit difficult" for him to grab items with his hands (*id.* at 75).

He also testified that the numbness and tingling that he experienced in his hands only affected his

index fingers, and that he could "easily move the other fingers," with only "a little bit" of pain.

(*Id.*)  The principles underlying the treating physician rule are not compromised when an ALJ's

decision is in accord with the claimant's description of his own limitations.  *See Salmini v.

Comm'r of Soc. Sec.*, 371 F. App'x 109, 114 (2d Cir. 2010) (finding that it is not error for an ALJ

to adopt a treating physician's findings "except insofar as [the] plaintiff admitted to a greater

degree of functionality" (internal quotation marks omitted)).

Accordingly, this Court does not recommend that this case be remanded on account of

the ALJ's only assigning "some weight" to Dr. Takeshige's opinion.  *See Shorter v. Comm'r of*

*Sec. Sec.*, No. 12cv1502 (NAM) (ATB), 2014 WL 1280459, at *11 (N.D.N.Y. Mar. 27, 2014) (affirming the Commissioner's denial of benefits where the ALJ only assigned "some weight" to a treating physician's opinion, because the ALJ, in fact, only partially rejected it, and his partial rejection was supported by substantial evidence).

### 2. Weight Given to the Opinion of Plaintiff's Treating Physiatrist, Dr. Hanan

Although Plaintiff's physiatrist, Dr. Hanan, did not provide a formal opinion specific to this case, the ALJ nonetheless reviewed Dr. Hanan's treatment notes, which stated that Plaintiff "should avoid heavy lifting."  (R. at 23, 375.)   Although the ALJ stated that she was assigning "significant weight" to that stated opinion (*id*. at 23), she effectively accorded it controlling weight, given that, in her RFC determination, the ALJ limited Plaintiff to "light work" (*id.* at 18), which entails "lifting no more than 20 pounds at a time," 20 C.F.R. §§ 404.1567(b), 416.967(b). Further, Plaintiff acknowledged that he could lift 20 pounds (*see* R. at 55 (testifying that he could lift "just about 20 pounds" of groceries)), and thus the ALJ's determination on this point comported with Plaintiff's own assessment of his abilities, rendering harmless any error as to the application of the treating physician rule with respect to the ALJ's weighing of Dr. Hanan's opinion.

### 3. Weight Given to the Opinion of Plaintiff's Treating Psychiatrist, Dr. Robotti, as Compared to the Weight Given to the Opinion of the Consulting Psychologist, Dr. Broska

Like Dr. Hanan, Plaintiff's treating psychiatrist, Dr. Robotti, did not provide a formal opinion specific to this case.  Nevertheless, the ALJ reviewed Dr. Robotti's contemporaneous treatment notes, focusing, in particular, on the GAF rating of 65 that Dr. Robotti assigned to Plaintiff in March 2013.  (R. at 23.)  Based on the GAF scale (*see supra* at n.35), the ALJ noted that this score reflected "mild" psychiatric symptoms (R. at 23).  After discussing the inherent

65

unreliability and limitations of a GAF rating and noting the lack of any explanation in

Dr. Robotti's records to support her GAF rating (*see id.*; *see also id.* at 23 n.1), the ALJ found

that the GAF rating was nonetheless "partially consistent with the treatment records," and,

treating it as opinion evidence, assigned it "some weight" (*id.* at 23).  In contrast, the ALJ stated

that she was assigning "significant weight" to the report of the consulting psychologist,

Dr. Broska (*id.*), who, after examining Plaintiff, opined that Plaintiff had "mild to moderate

limitations at time in his ability to appropriately deal with stress" (*id.* at 978), but that Plaintiff's

mental impairments were not significant enough to interfere with his ability to function on a

daily basis (*id.*), and that he had the ability to follow simple instructions, perform tasks

independently, pay attention, and concentrate (*id.*).  In her decision, the ALJ stated that

Dr. Broska's findings were "reinforced by objective findings in the record and [Plaintiff's] own

subjective statements."  (*Id.* at 23-24.)

    As discussed above, it was not error, in this particular case (where Plaintiff never claimed

that he was disabled as the result of any psychiatric condition), for the ALJ not to have sought to

develop the Record with a more formal opinion from Dr. Robotti.  (*See generally* Discussion,

*supra*, at Section III(A).)  In addition, a review of Dr. Robotti's treatment records shows that the

ALJ did not actually discount any opinions that were manifest in those records, but rather

reached an RFC determination that was consistent with them, if not more restrictive with respect

to Plaintiff's mental impairments.

    First, it should be noted that the ALJ ultimately determined that Plaintiff's psychiatric

limitations were "no greater than moderate."  (R. at 26.)  Given that the GAF score given to

Plaintiff by Dr. Robotti was suggestive of only mild impairments, the ALJ's determination as the

extent of Plaintiff's psychiatric impairments cannot be said to have discounted the significance

of the treater's assessment.  Second, upon review of the Record, this Court finds that, wherever
Dr. Broska's opinion addressed the same areas as Dr. Robotti's treatment notes, the two were
actually consistent with each other, as well as with the ALJ's RFC determination.  Both Drs.
Broska and Robotti, upon examining Plaintiff, found that he was well-groomed, spoke
intelligibly, demonstrated a logical and goal directed thought process, had a "full" affect, showed
an ability to concentrate and maintain attention within normal limits, exhibited an unimpaired
memory and "normal" or "average" intellectual functioning, and demonstrated "good" or "fair"
orientation, insight, and judgment.  (*Compare id.* at 976-77 *with id.* at 1002-03.)  In fact,
nowhere do Dr. Robotti's treatment notes reflect any psychiatric limitations that the ALJ
dismissed or discounted, such that remanding the case for a more thorough discussion of the
factors relevant to the assignment of the weight given by the ALJ to the psychiatric opinion
evidence would have any likelihood of altering the ALJ's conclusion.  *See Zabala*, 595 F.3d at
409 ("[W]here application of the correct legal principles to the record could lead [only to the
same] conclusion, there is no need to require agency reconsideration." (citations and internal
quotation marks omitted)).  Third, to the extent Plaintiff testified, at the administrative hearing,
regarding symptoms of any psychiatric condition, he only described anxiety attacks and
explained that such attacks would tend to incapacitate him only for 20 minutes once or twice per
week (*id.* at 62-63) – a limitation that the ALJ then incorporated into Plaintiff's RFC (*id.* at 18).

Under these circumstances, this Court cannot conclude that that ALJ committed legal
error with regard to her weighing of Dr. Broska's opinion, *see Schwerdt v. Comm'r of Soc. Sec.*,
No. 15cv895 (DNH) (CFH), 2015 WL 5773021, at *14 n.6 (N.D.N.Y. Sept. 30, 2015) (finding
no error in the ALJ's decision to accord "significant weight" to the opinion of a consultative

examiner, where the opinion was consistent with the record as a whole), or with respect to her application of the treating physician rule, in general.[51]

### C.   The ALJ Properly Assessed Plaintiff's Credibility.

Adhering to the required two-step process for assessing a claimant's credibility, the ALJ first found finding that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms.  (*Id.* at 18-19.)  The ALJ then determined that Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms were "not entirely credible."  (*Id.* at 18-19, 24-26.)  As noted, an ALJ may exercise his or her discretion in weighing a claimant's testimony "in light of the other evidence in the record," but must provide "specific reasons" for the weight that he or she assigns.  (*See supra*, Discussion, at Section I(E).)  As set forth above, the ALJ provided numerous specific reasons to support her finding that Plaintiff's allegations as to the severity of his symptoms were less than credible. Upon review of the Record, although this Court does not find certain of the ALJ's reasons to be persuasive, this Court does find that, overall, substantial evidence supports the ALJ's credibility finding.

As to the ALJ's reasoning that appears flawed, this Court notes the following.  First, Plaintiff's testimony that he was laid off in 2009 "due to lack of work" rather than a disabling impairment is irrelevant given that he has alleged a disability onset date of November 25, 2011. Second, the ALJ appears to have mistakenly presumed that Plaintiff exaggerated a prior suicide attempt in stating that he took "100 pills."  (*Id.* at 25.)  The ALJ's reference to treatment records

---

[51] As a consultative examiner's opinion is generally entitled to "little weight," *Giddings*, 333 F. App'x at 652, and, as Dr. Bhutwala's opinion does not appear to have been incorporated at all into the ALJ's RFC determination, this Court finds no legal error in the weight assigned to Dr. Bhutwala's opinion, and does not discuss his opinion further.

in which Plaintiff reported having ingested only two pills relates to a separate suicide attempt. (*Compare id.* at 975 (noting that Plaintiff reported having taken 100 pills in a 1999 suicide attempt) *with id.* at 291 (noting that Plaintiff reported having taken two pills and two vodka shots in a 2009 suicide attempt).)  Third, the ALJ's seeming reliance on "the absence of any electrodiagnostic testing for neuropathy" to discount Plaintiff's testimony that he suffered from tingling in his bilateral index fingers (*id.* at 15, 25) is unpersuasive, given Plaintiff's lengthy history of uncontrolled diabetes and diagnoses of at least some level of diabetic neuropathy (*see, e.g.*, *id.* at 378, 454-55, 1190-91).[52]  *See also Cichocki*, 534 F. App'x at 76 ("Objective medical evidence is useful, but the ALJ will not reject statements about the intensity and persistence of pain and other symptoms 'solely because the available objective medical evidence does not substantiate [the claimant's] statements.' (quoting 20 C.F.R. § 416.929(c)(1)).  Finally, the basis for the ALJ's assertion that Plaintiff had refused "to even consider taking psychiatric prescriptions" except for Xanax is unclear.  (*See id.* at 25-26.)  Indeed, Dr. Robotti's notes show that Plaintiff was willing to "reconsult" as to prescription medication once his psychotherapy was underway.  (*Id.* at 1006.)

The ALJ, however, also gave several other reasons for finding Plaintiff "not entirely credible" that are supported by substantial evidence.  As one example, the ALJ noted Plaintiff's reports of being able to perform a wide range of daily activities independently (*id.* at 25, 54-55, 217-21, 977), which appeared to be inconsistent with the degree of disabling symptoms that he alleged, *see Browne v. Comm'r of Soc. Sec.*, 131 F. Supp. 3d 89, 101 (S.D.N.Y. 2015) (noting

---

[52] Symptoms of diabetic neuropathy include numbness in the hands, legs, or feet, shooting pains, burning, tingling, constipation, diarrhea, urinary problems, and dizziness, among others.  *See* https://medlineplus.gov/diabeticnerveproblems.html (last accessed Jan. 26, 2017).

that plaintiff "reported numerous activities of daily living that supported the conclusion that [plaintiff] could do light work").[53]

Moreover, the ALJ noted Plaintiff's testimony that, while he performed clerical work through his welfare office, he was able to control his bowel incontinence by limiting his medication intake.  (*Id.* at 25, 74.)  As Plaintiff performed this work for three days per week and five or six hours per day – after his alleged disability onset date (*see id.* at 47) – Plaintiff's testimony, at the very least, supports the ALJ's conclusion that Plaintiff's bowel incontinence was "controllable" (*id.* at 25).  Indeed, one of Plaintiff's doctors previously advised him that he could control his incontinence by refraining from his "abuse" of laxatives.  (*Id.* at 587, 622-23.)

In addition, in assessing Plaintiff's credibility, the ALJ properly called attention to Plaintiff's consistent refusal to comply with his diabetes treatment plan.  *See Wells v. Colvin*, 87 F. Supp. 3d 421, 432 (W.D.N.Y. 2015) ("Because the medical record shows that Plaintiff was noncompliant with medications and inconsistent in following medical advice . . . , the ALJ did not err in considering Plaintiff's noncompliance in evaluating Plaintiff's credibility." (collecting cases)).  As set out above, records from 2010 through the date of the hearing before the ALJ show that Plaintiff refused to monitor his blood glucose level or inject himself with insulin, despite extensive education regarding the risks of noncompliance by his physicians.  (*See, e.g.*, *id.* at 69, 296, 385-86, 558, 602, 1071, 1143, 1183, 1289, 1343-44.)

The ALJ also appropriately noted that, despite Plaintiff's complaints of disabling symptoms, his "treatment ha[d] been sporadic and relatively routine and conservative."  (*Id.* at

---

[53] Although Plaintiff testified that he performed certain of these activities with pain, "'disability requires more than mere inability to work without pain.  To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment.'"  *Donnelly v. Comm'r of Soc. Sec.*, 49 F. Supp. 3d 289 (E.D.N.Y. 2014) (quoting *Prince v. Astrue*, 490 F. App'x 399, 400 (2d Cir. 2013)).

25; *see Sagastivelsa-Garcia v. Colvin*, No. 12cv9168 (JMF), 2014 WL 85121, at *2 (S.D.N.Y. Jan. 6, 2014) (finding no error in ALJ's determination that plaintiff's allegations were not credible where his allegations were, *inter alia*, "belied by the overall conservative treatment she had received").)  Although it is not entirely clear which "treatment" the ALJ was referencing, substantial evidence indicates that Plaintiff's treatment for at least his right shoulder, lower back, and left knee was, in fact, sporadic, routine, and conservative during the relevant time period.  As discussed above, upon examining Plaintiff for his right shoulder pain, Dr. Hanan would typically discharge Plaintiff home to his usual activities, advise him to avoid heavy lifting, recommend that he take Tylenol as needed, and/or refer him to occupational therapy.  (*See, e.g.*, *id.* at 350, 375, 571, 593.)  At several appointments with Dr. Hanan and other treaters regarding his right shoulder pain, Plaintiff reported that he was not even taking any pain medication.  (*See, e.g.*, *id.* at 358, 375, 759, 1147, 1163.)  Moreover, although doctors discussed surgery and steroidal injections with Plaintiff for his lower back pain (*see id.* at 1407), the medical records only reflect that Plaintiff underwent treatment for his lower back pain in the form of "conservative management" and physical therapy (*see id.* at 1045-50, 1062, 1166, 1407).  Finally, there are minimal records regarding Plaintiff's receiving any treatment for his left knee pain.  After an X-ray of Plaintiff's left knee showed "mild" degenerative joint disease, an orthopedist who reviewed that X-ray prescribed Plaintiff Diclofenac, a medication "used to relieve mild to moderate pain,"[54] and Caspaicin, an over-the-counter topical cream,[55] advised him to continue his home exercise program, and scheduled a follow-up appointment with Plaintiff for six months later.  (*Id.* at 802.)

---

[54] https://medlineplus.gov/druginfo/meds/a689002.html (last accessed Jan. 26, 2017).

[55] http://www.mayoclinic.org/drugs-supplements/capsaicin-topical-route/description/drg-20062561 (last accessed Jan. 26, 2017).

In sum, this Court finds no error in the ALJ's decision to find Plaintiff's subjective complaints regarding his symptoms and their effect on his ability to work to be "not entirely credible."

**D.      The ALJ's Decision Is Supported By Substantial Evidence.**

Having determined that remand is not warranted based on legal error – either with respect to any failure to develop the Record, to weigh the opinion evidence in accordance with applicable standards, or to assess Plaintiff's credibility properly – this Court turns to the question of whether the ALJ's decision is supported by substantial evidence.

This Court first finds that the ALJ's analysis at steps two and three of the sequential evaluation (in which the ALJ identified several severe impairments, but determined that none, either singly or in combination, met or medically equaled a Listed impairment) was adequately supported by the medical evidence and the criteria of the relevant Listings, as discussed by the ALJ in her decision.  (*See generally* R. at 15-18.)

Second, this Court finds that the ALJ's RFC determination was supported by substantial evidence in the Record.  As discussed above, the RFC determination largely incorporated the opinions expressed by Plaintiff's primary care physician, Dr. Takeshige, and, in certain respects, provided for even greater restrictions on Plaintiff's ability to work.  (*Compare id.* at 18 *with id.* at 1410-15.)  Dr. Takeshige examined Plaintiff frequently throughout the relevant time period, and her treatment notes reflect an awareness and understanding of each of the impairments that Plaintiff claimed to be disabling, including his diabetes, his shoulder, back, and knee pain, and conditions affecting his heart, bladder, and digestive system.  (*See, e.g.*, *id.* at 1070-73, 1142-45, 1343-46; *see also* Compl. ¶ 4.)  In addition to being supported by Dr. Takeshige's reported opinion, the ALJ's RFC determination was also supported by treatment notes from a number of

Plaintiff's physicians, indicating that several of Plaintiff's conditions had improved over time with treatment (*e.g.*, *id.* at 1119 (heart problems), 1131 (GERD)); by Plaintiff's occupational therapist's treatment notes indicating that Plaintiff had demonstrated full active range of motion and full strength (*id.* at 1153-54) and Dr. Revan's report indicating the same (*id.* at 982); and by the conservative pain treatment prescribed by Dr. Hanan and others (*e.g.*, *id.* at 375, 1407).  *Cf. Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010) ("RFC to perform light work was supported by objective evidence of physical examinations at which physicians reported [his] full range of motion and strength in her upper and lower extremities, ability to walk without difficulty, and lack of muscle atrophy").

       The RFC assessment was also largely supported by Plaintiff's own testimony, as he conceded that he was able to manage his various symptoms in performing clerical work part-time in 2014 by, for example, alternating between sitting and standing and limiting his laxative intake. (R. at 49, 53, 74.)  Plaintiff also consistently reported that he was able to perform numerous daily activities with complete independence, throughout the relevant period, including shopping for, lifting, and carrying home 20 pounds of groceries.  (*Id.* at 54-55, 217-21, 977.)  In this respect, Plaintiff's own testimony lends support to the RFC determination.  *See Browne*, 131 F. Supp. 3d at 101 (finding that the claimant's reported "numerous activities of daily living" such as preparing his own meals, doing laundry, and using public transportation independently "supported the conclusion that [the claimant] could do light work").  The Record also reflects that, at least in 2014, Plaintiff had shown an ability to function in a work setting, by performing clerical work through his welfare office.  (*Id.* at 48-50.)

       Recognizing that Plaintiff has not alleged that he was disabled due to any mental impairments, this Court also finds that substantial evidence supported the determinations made

by the ALJ regarding the extent of Plaintiff's psychiatric limitations.  As discussed above, one such limitation that the ALJ included in Plaintiff's RFC – that he would "be off-task and unable to concentrate for 20 minutes up to twice a week at unscheduled times" (*id.* at 18) – was directly based on Plaintiff's testimony as to the extent of his anxiety attacks (*see id.* at 62-63).  Additional limitations included by the ALJ – including that Plaintiff could only occasionally socialize with others, and that he would need to work at his own pace (*id.* at 18) – were also based on substantial evidence in the Record (*e.g.*, *id.* at 45-46, 62-63, 978, 1001-03).

Finally, this Court finds that substantial evidence supported the ALJ's ultimate determination that jobs that Plaintiff was able to perform existed in significant numbers in the national economy.  Here, the ALJ relied on the testimony of a vocational expert, as was appropriate, given Plaintiff's several non-exertional impairments.  *See Bapp*, 802 F.2d at 604-05.  While, at the hearing, the vocational expert did testify that "competitive employment would be hard to maintain" for an individual who would need to visit a bathroom five times a day for an average time of about 10 minutes per visit (R. at 91), and that the three jobs he had identified "would not be sustainable with [only] occasional concentration" (*id*. at 92), the ALJ ultimately did not include either of those limitations in her RFC determination (*id*. at 18).  Substantial evidence supported that aspect of her decision.  As for the length of the bathroom breaks that Plaintiff would need, the Record not only reflected, as noted above, that Plaintiff had been able to function in a work setting by limiting his laxative use, but, as already discussed, it also contained a medical treater's recorded impression that Plaintiff had engaged in "laxative abuse." (*Id*. at 74, 76, 622.)  This was sufficient to support the ALJ's finding that Plaintiff's supposed chronic bowl incontinence was "controllable."  (*Id*. at 25; *cf. Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be

considered disabling.").)  Substantial evidence also supported the ALJ's decision not to include, in Plaintiff's RFC, any limitations regarding "concentration" (except in the context of Plaintiff's reported anxiety attacks); on this issue, both Plaintiff's treating psychiatrist and the consulting psychologist had found, upon examination, that Plaintiff's concentration was not, in fact, impaired.  (R. at 977-78, 1002.)

As to whether the vocational expert's testimony was sufficient to support the ALJ's determination that there were jobs available that a person with Plaintiff's RFC could perform, this Court notes that occupational evidence provided by a vocational expert "generally should be consistent with the occupation information supplied by the DOT."  SSR 00-4p (S.S.A. Dec. 4, 2000).  Where there is an "apparent unresolved conflict" between the vocational expert's evidence and the DOT, the ALJ "must elicit a reasonable explanation for the conflict before relying on the [vocational expert's] evidence to support a determination or decision about whether the claimant is disabled."  *Id.*  In this case, Vaughn, the vocational expert, identified three jobs that an individual with Plaintiff's RFC could perform.  (*Id.* at 88-90.)  He testified that such an individual would be able to perform these jobs, in part, because they each provided for a sit/stand option.  (*Id.*)  Under questioning by the ALJ, however, Vaughn acknowledged that the DOT did not identify a sit/stand option in describing these jobs.  (*Id.* 89, 92.)  Vaughn explained that his testimony that the three jobs provided for a sit/stand option was "based on observation and professional assessments."  (*Id.* at 92.)

Courts have found similar explanations for vocational expert testimony that deviates from the DOT to be sufficient.  *See McIntyre v. Colvin*, No. 12cv318 (GTS), 2013 WL 2237828, at *6 (N.D.N.Y. May 21, 2013) (holding that an ALJ committed no legal error in relying upon the testimony of a vocational expert, who testified on the basis of his "professional experience and

clinical judgment" that certain occupations provided for a sit/stand option, where the DOT did

not address such an option), *aff'd*, 758 F.3d 146, 152 (2d Cir. 2014) (holding that the ALJ was

"not required to articulate a more specific basis for his opinion" than "professional experience

and clinical judgment," where his opinion "was not undermined by any evidence in the

record").[56]   Accordingly, the ALJ was entitled to rely on Vaughn's testimony in concluding that

Plaintiff was capable of working at jobs that existed in significant numbers in the national

economy.

## CONCLUSION

For all of the foregoing reasons, this Court recommends that Defendant's motion for

judgment on the pleadings (Dkt. 11) be granted, and that Plaintiff's Complaint (Dkt. 2) be

dismissed.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail).

Such objections, and any responses to objections, shall be filed with the Clerk of Court, with

courtesy copies delivered to the chambers of the Honorable Alison J. Nathan, United States

Courthouse, 40 Foley Square, Room 2102, New York, New York 10007, and to the chambers of

the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York

10007.  Any requests for an extension of time for filing objections must be directed to

---

[56] Moreover, other courts have held that, where a vocational expert testifies as to a
sit/stand option for a particular occupation, and the DOT is silent as to such an option, the
vocational expert's testimony does not, in fact, conflict with the DOT.  *Wellington v. Astrue*,
No. 12cv3523 (KBF), 2013 WL 1944472, at *4 (S.D.N.Y. May 9, 2013) (collecting cases).
Where there is no conflict, no explanation from the vocational expert as to the basis of his or her
testimony is even required.  *Id.*; *see also* SSR 00-4p ("A [vocational expert] . . . may be able to
provide more specific information about jobs or occupations than the DOT.").

Judge Nathan. As Plaintiff is proceeding in this action *pro se*, any submissions he makes to the Court (including any objections to this Report and Recommendation for filing, any courtesy copies for judges' chambers, and any requests for extensions of time) should be mailed or otherwise delivered by him to the Court's *Pro Se* Office. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECULDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
       February 1, 2017

                                  Respectfully submitted,

                                  DEBRA FREEMAN
                                  United States Magistrate Judge

Copies to:

Hon. Alison J. Nathan, U.S.D.J.

Mr. Andrew La Paz
1682 Sewand Avenue, Apt. 3C
Bronx, NY 10473

Defendant's counsel (via ECF)